UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **MIRAGE INTERESTS, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CASE NO. 1:16-cv-00594-LY** |
| | § | |
| **ANCHOR INSURANCE HOLDINGS,** | § | |
| **INC.,** | § | |
| | § | |
| **Defendant.** | § | |

**PLAINTIFF MIRAGE INTERESTS, INC.'S
FIRST AMENDED MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff Mirage Interests, Inc. ("**Mirage**") moves for summary judgment pursuant to Fed. R. Civ. P. 56 on its claims against Defendant Anchor Insurance Holdings, Inc. ("**Anchor**"), and would respectfully show:

**SUMMARY OF AMENDMENT**

This amended pleading is filed because the original motion contained the incorrect escrow agreement relating to the funds at issue. Mirage does not possess a fully executed copy of an escrow agreement for the $500,000 at issue in this case and has presented several requests for the escrow agreement. In response, Mirage received an agreement that neither Mirage nor Anchor signed. No amendments have been made relating to the substantive issue relating to the failure to provide notice.

## STATEMENT OF THE CASE

Mirage and Anchor are parties to a Stock Purchase Agreement (the "**Agreement**") calling for the sale of certain interests in insuring entities. Under their Agreement, the parties agreed to set aside a portion of the purchase price payment as a mechanism to adjust the purchase price based on claims experience for 2015. The amount of the purchase price that was set aside was $500,000.

Under the Agreement, Anchor was obligated to give notice on or before January 31, 2016 if Anchor was making a claim to retain any of the set aside. In addition to the contractual deadline, the notice statement was to include a calculation of the losses and expenses and was required to be supported by related backup information and documentation. There is no dispute that Anchor did not give notice on or before January 31, 2016. Accordingly, Mirage is entitled to summary judgment on its declaratory judgment action that it is entitled to payment of the full set aside amount under the Agreement.

## STANDARD OF REVIEW

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);

*Avalon Residential Care Homes, INc. v. City of Dallas*, 130 F. Supp.2d 833, 838 (N.D. Tex. 2000).

Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Avalon*, 130 F. Supp.2d at 838. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case on which it bears the burden of proof, summary judgment must be granted. *Id.*

Summary judgment is also proper against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. A "complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Id.* at 323.

### FACTS

Under the Agreement, Mirage was seller and Anchor was buyer of interests in the following entities: (1) Ranchers and Farmers Insurance Company, a Texas insurance corporation; (2) Spindletop Premium Finance, Inc., a Texas corporation; and (3) Southeast Surplus Underwriters General Agency, Inc., a Texas corporation (the "Acquired Companies"). The Agreement is attached as **Exhibit 1**.

The Agreement contained a clause outlining a process by which the purchase price paid by Anchor to Mirage for the Acquired Companies could be adjusted

downward upon the occurrence of a number of events, including a requirement pertaining to delivery of notice to Mirage by Anchor on or before a specified deadline. *See* **Exhibit 1**, ¶¶ 1.1-3.

The adjustment, in an amount not to exceed $500,000, could be made if a certain net asset value adjustment threshold was met, or if a net loss development calculation confirmed certain losses and expenses exceeded a $75,000 allowance. *See* **Exhibit 1**, ¶ 1.3; **Exhibit 2**, Declaration of Wesley Shipley, ¶ 5.

If either of the foregoing conditions were met, and if Anchor performed the necessary analysis with the appropriate documentation confirming the underlying calculations, Anchor could invoke the adjustment process by transmitting a timely Net Loss Development statement to Mirage. *See* **Exhibit 1**, ¶¶ 1.3.

With regard to the timeliness of any notice seeking to invoke the process by which Anchor could request a Net Loss Development adjustment, the Agreement provides a specific deadline of January 31, 2016.

> **By no later than January 31, 2016, Buyer shall prepare and deliver to Seller a statement setting forth the amount of the Net Loss Development, which shall be accompanied by reasonable detail and related backup information.**

*See* **Exhibit 1**, ¶ 1.3(b)(i).

No such notice was sent by Anchor or received by Mirage on or before January 31, 2016. *See* **Exhibit 2**, ¶ 8. Accordingly, under the Agreement, Anchor did not request any adjustment under the Agreement, and no adjustment should be made.

The parties discussed setting aside the $500,000 amount in a trust escrow to be held until Anchor gave notice of a claim for price adjustment or the time for notice of a claim for adjustment had expired. Mirage recently contacted the firm of Milam Howard Nicandri Dees & Gillam, P.A., who represents Anchor in this action and is also holding the $500,000 amount in trust, to obtain a copy of the signed escrow agreement. The document attached as **Exhibit 3** was provided in response to the request; however, the document presented was not signed by Mirage or Anchor.

In addition, the unsigned escrow agreement provides that the funds were to be disbursed on March 1, 2016. *See* **Exhibit 3**, ¶ 3(b). No adjustments were made prior to March 1, 2016 because the required notice was not provided. *See* **Exhibit 2**, ¶ 9. Nevertheless, Anchor has refused to execute any notice authorizing release of the funds held in trust to Mirage and has likewise refused to consent to release of the funds. *See* **Exhibit 2**, ¶ 10.

### ARGUMENT AND AUTHORITIES

Mirage sues Anchor for breach of contract due to Anchor's failure to tender full payment to Mirage under the Agreement and for its failure to authorize the release of the funds to Mirage.

The Supreme Court of Texas has consistently held that parties are to be held to the terms of the contract they negotiated and executed. The Supreme Court of Texas

recently explained this principle in its opinion in *FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, 426 S.W.3d 59, (Tex. 2014):

> At the outset, we note that sophisticated parties have broad latitude in defining the terms of their business relationship. *See Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 58 (Tex. 2008) (articulating the principle that Texas courts should uphold contracts "negotiated at arm's length by 'knowledgeable and sophisticated business players' represented by 'highly competent and able legal counsel'" (quoting *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 180 (Tex. 1997)). We must construe contracts by the language contained in the document, with a mind to Texas's strong public policy favoring preservation of the freedom to contract. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 811-12 (Tex. 2012); *see also Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26 (Tex. App.— Amarillo 2000, no pet.) ("In short, the parties strike the deal they choose to strike and, thus, voluntarily bind themselves in the manner they choose.").

*Id*. at 67.

Courts "have an obligation to construe a contract by the language contained in the document." *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 811 (Tex. 2012). Contract enforcement is an "indispensable partner" to the freedom of contract. *Id*. at 812. "The role of the courts is not to protect parties from their own agreements, but to enforce contracts that parties enter into freely and voluntarily." *Id*. at 811-12.

The Agreement is exactly the type of contractual agreement that should be enforced as written and agreed to by the parties. The Agreement clearly provides that "**[b]y no later than January 31, 2015**, [Anchor] shall prepare and deliver to [Mirage] a statement setting forth the amount of the Net Loss Development, which shall be accompanied by reasonable detail and backup information." **<u>Exhibit 1</u>**, p. 2 (emphasis

added). Thus, the Agreement provided for a specific deadline if Anchor was to avail itself of the procedure by which it could present a claim for the funds. Anchor did not elect to provide the request and supporting documentation by the deadline agreed to by the parties. Thus, Anchor has no claim to any funds held in trust and the entire amount was to be released to Mirage.

Such failure and refusal to allow for the release of funds is in contravention of the terms and conditions of the Agreement and constitutes a breach of the Agreement by Anchor.  Mirage has made demand on Anchor seeking compliance with the Agreement; however, Anchor has failed and refused to take any steps to authorize release of all sums held in trust. *See* **Exhibit 2**, ¶ 10. Mirage seeks summary judgment that it is entitled to be paid the amounts held in trust, along with pre and post-judgment interest.

## PRAYER

Wherefore Premises Considered, Plaintiff Mirage Interests, Inc. prays that the Court: (1) grant its Motion for Summary Judgment against Defendant Anchor Insurance Holdings, Inc.; (2) order the release of the amounts currently held in trust; (3) enter judgment in favor of Mirage in the amount of the $500,000 set aside; and (4) award Mirage pre-judgment and post-judgment interest on the $500,000 amount until such sum is paid to Mirage. Mirage requests such other and further relief to which Mirage may show itself to be justly entitled, at law and in equity.

DATE: October 14, 2016

Respectfully submitted,

**WINSTEAD PC**
401 Congress Avenue
Suite 2100
Austin, Texas  78701
512/370-2800 telephone
512-370-2850 telecopier

By:     _/s/ Alex S. Valdes_____
           Keith Hopkinson          SBN 24012849
           Alex S. Valdes            SBN 24037626

**ATTORNEYS FOR PLAINTIFF**
**MIRAGE INTEREST, INC.**

## CERTIFICATE OF SERVICE

By my electronic signature below, I certify, that on October 14, 2016, a copy of this First Amended Motion for Summary Judgment was served on the following via the Electronic Court Filing System and via email:

BECK | REDDEN LLP
Eric J.R. Nichols
515 Congress Avenue, Suite 1900
Austin, Texas 78701
enichols@beckredden.com

MILAM HOWARD NICANDRI
DEES & GILLAM, P.A.
Peter E. Nicandri
14 East Bay Street
Jacksonville, Florida 32202
pnicandri@milamhoward.com

**Attorneys for Defendant**
**Anchor Insurance Holdings, Inc.**

/s/ Alex S. Valdes
Alex S. Valdes

# Exhibit 1 – Stock Purchase Agreement

STOCK PURCHASE AGREEMENT

BY AND BETWEEN

ANCHOR INSURANCE HOLDINGS, INC.

AND

MIRAGE INTERESTS, INC.

Dated:   As of August 15 2014

TABLE OF CONTENTS

Page

ARTICLE 1 TRANSACTION; PURCHASE PRICE; CLOSING.................................. 1
    1.1    Basic Transaction.................................................................................... 1
    1.2    Purchase Price ........................................................................................ 1
    1.3    Purchase Price Adjustments.................................................................... 2
    1.4    The Closing ............................................................................................. 3
    1.5    Deliveries at the Closing ........................................................................ 3

ARTICLE 2 REPRESENTATIONS AND WARRANTIES OF MIRAGE................. 3
    2.1    Capacity and Authorization of Mirage ................................................... 4
    2.2    Noncontravention.................................................................................... 4
    2.3    Brokers' Fees .......................................................................................... 4

ARTICLE 3 REPRESENTATIONS AND WARRANTIES CONCERNING THE
SHARES ................................................................................................................. 4
    3.1    Organization, Qualification, and Corporate Power................................. 4
    3.2    Capitalization ......................................................................................... 5
    3.3    Noncontravention.................................................................................... 5
    3.4    Insurance Legal Compliance.................................................................. 6
    3.5    Insurance Issued by RFIC and SSUGA ................................................. 6
    3.6    Brokers' Fees .......................................................................................... 7
    3.7    Financial Statements; Liabilities............................................................ 7
    3.8    Events Subsequent to Most Recent Fiscal Period End .......................... 8
    3.9    Regulatory Filings.................................................................................. 9
    3.10   Tax Matters ............................................................................................ 9
    3.11   Real Property ......................................................................................... 9
    3.12   Title to Assets ...................................................................................... 10
    3.13   Intellectual Property............................................................................. 10
    3.14   Contracts .............................................................................................. 10
    3.15   Insurance .............................................................................................. 11
    3.16   Material Litigation ............................................................................... 11
    3.17   Labor and Employment Matters .......................................................... 12
    3.18   Employee Benefits ............................................................................... 12
    3.19   Guaranties ............................................................................................ 12
    3.20   Environment, Health and Safety.......................................................... 12
    3.21   Certain Business Relationships with the Companies............................ 13
    3.22   Stock Records ...................................................................................... 13
    3.23   Labor Relations .................................................................................... 13
    3.24   Customers ............................................................................................ 13
    3.25   Licenses and Permits............................................................................ 13

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER ................. 13
    4.1    Organization of Buyer.......................................................................... 13
    4.2    Authorization of Buyer ........................................................................ 13

i

4.3     Noncontravention.................................................................................... 14
4.4     Brokers' Fees........................................................................................... 14
4.5     Investment Representations..................................................................... 14
4.6     Financing................................................................................................ 15
4.7     Absence of Litigation.............................................................................. 15
4.8     No Knowledge of Misrepresentations or Omissions ............................. 15
4.9     No Other Representations........................................................................ 15

ARTICLE 5 PRE-CLOSING COVENANTS ..................................................................... 15
5.1     General; Timing of Closing..................................................................... 15
5.2     Notices and Consents.............................................................................. 16
5.3     Operation of Business............................................................................. 16
5.4     Preservation of Business......................................................................... 16
5.5     Full Access.............................................................................................. 16
5.6     Notice of Developments.......................................................................... 17
5.7     Disclosure Schedule Update ................................................................... 17
5.8     Compensation Arrangements.................................................................. 17
5.9     Employees; Consultants.......................................................................... 18
5.10    Office Lease............................................................................................ 18

ARTICLE 6 POST-CLOSING COVENANTS ................................................................... 18
6.1     General .................................................................................................... 18
6.2     Indemnification....................................................................................... 18
6.3     Mutual Cooperation ............................................................................... 19

ARTICLE 7 CONDITIONS TO OBLIGATION TO CLOSE ............................................ 21
7.1     Conditions to Obligation of Buyer......................................................... 21
7.2     Conditions to Obligation of Seller......................................................... 22

ARTICLE 8 INDEMNIFICATION..................................................................................... 23
8.1     Survival of Representations and Warranties........................................... 23
8.2     Indemnification Provisions for Benefit of Buyer................................... 23
8.3     Indemnification Provisions for Benefit of Seller ................................... 23
8.4     Exclusive Remedy .................................................................................. 23

ARTICLE 9 LIMITATIONS ON INDEMNIFICATION ................................................... 24
9.1     Term........................................................................................................ 24
9.2     Indemnification Basket........................................................................... 24
9.3     Limited Recourse.................................................................................... 24

ARTICLE 10 COOPERATION .......................................................................................... 25
10.1    Notice of Claims..................................................................................... 25
10.2    Right to Defense ..................................................................................... 25
10.3    Calculation of Amounts; Other Limitations .......................................... 26

ARTICLE 11 DISPUTE RESOLUTION ............................................................................ 27
11.1    Exclusive Procedure for Dispute Resolution ......................................... 27

ii

11.2    Negotiation Between Executives ................................................................ 27
11.3    Mediation ................................................................................................. 27
11.4    Litigation .................................................................................................. 27
11.5    Provisional Remedies ................................................................................ 27
11.6    Tolling Statutes of Limitation .................................................................. 28
11.7    Performance to Continue .......................................................................... 28

ARTICLE 12 TERMINATION ................................................................................. 28
12.1    Termination of Agreement ........................................................................ 28
12.2    Effect of Termination ............................................................................... 29
12.3    Break Up Fees .......................................................................................... 29

ARTICLE 13 DEFINITIONS ................................................................................... 29

ARTICLE 14 MISCELLANEOUS ............................................................................ 33
14.1    Press Releases and Public Announcements .............................................. 33
14.2    No Third-Party Beneficiaries .................................................................... 33
14.3    Entire Agreement ..................................................................................... 33
14.4    Succession and Assignment ...................................................................... 33
14.5    Counterparts ............................................................................................. 33
14.6    Headings ................................................................................................... 33
14.7    Notices ...................................................................................................... 33
14.8    Governing Law, Consent to Jurisdiction ................................................. 34
14.9    Amendments and Waivers ........................................................................ 34
14.10   Severability .............................................................................................. 35
14.11   Expenses ................................................................................................... 35
14.12   Incorporation of Exhibits and Schedules ................................................ 35
14.13   Interpretation ........................................................................................... 35
14.14   WAIVER OF JURY TRIAL ..................................................................... 35

**EXHIBITS:**

"A"    -    Form of Employment Agreement

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this "Agreement") is entered into as of August 15, 2014 (the "Effective Date"), by and between Anchor Insurance Holdings, Inc., a Florida corporation ("Buyer"), and Mirage Interests, Inc., a Texas corporation ("Mirage" or "Seller") and the sole owner of Ranchers and Farmers Insurance Company, a Texas insurance corporation ("RFIC"), Spindletop Premium Finance, Inc., a Texas corporation ("Spindletop"), and Southeast Surplus Underwriters General Agency, Inc., a Texas corporation ("SSUGA"and together with RFIC and Spindletop, the "Companies" and individually, a "Company"). Buyer and Seller are sometimes referred to collectively herein as the "Parties." Capitalized terms used in this Agreement but not defined in the body of this Agreement have the meanings ascribed to them in Article 13. Capitalized terms defined in the body of this Agreement are listed in Article 13 by location of the definition of such terms in the body of this Agreement.

## RECITALS

This Agreement contemplates a transaction in which Buyer will purchase from Mirage, and Mirage will sell to Buyer, all of the issued and outstanding capital stock of each of the Companies (collectively, the "Shares") in return for the cash consideration and other obligations set forth below.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows.

## ARTICLE 1
## TRANSACTION; PURCHASE PRICE; CLOSING

1.1     Basic Transaction.  On and subject to the terms and conditions of this Agreement, at the Closing, Buyer agrees to purchase from Mirage, and Mirage agrees to sell, assign, transfer and deliver to Buyer, all of the outstanding capital stock of the Companies, for the Purchase Price, free and clear of any and all Security Interests. The Shares of the Companies to be sold, assigned and transferred pursuant to this Article 1 represent in the aggregate all of the issued and outstanding shares of the capital stock of the Companies.

1.2     Purchase Price.  In consideration of the sale of the Shares, Buyer shall deliver to Seller, subject to the adjustments described herein, Four Million Five Hundred Thousand Dollars ($4,500,000.00) (the "Purchase Price"), payable in accordance with the following:

(a)     Four Million Dollars ($4,000,000.00) of the Purchase Price shall be payable in cash at the Closing;

(b)     The remainder of the Purchase Price shall be payable in cash on or before March 1, 2016, which such payment shall be secured by a trust account or letter of credit, and may be subject to adjustments as set forth in Section 1.3, and indemnification claims made in accordance with Section 8.2;

(c)     All payments shall be by wire transfer, to be deposited in such bank accounts as Seller shall designate in writing to Buyer prior to the Closing; and

(d)     The Purchase Price is to be allocated among the Companies as set forth in Section 1.2(d) of the disclosure schedule delivered by Seller to Buyer on the Effective Date, a copy of which is attached hereto and acknowledged by the Parties (the "Disclosure Schedule")

1.3     Purchase Price Adjustments.  Following the Closing, the Purchase Price shall be adjusted (x) if the Closing Net Asset Value is more than five percent (5.0%) different from the Starting Net Asset Value; and (y) to reflect the difference between the Companies' Net Loss Development between the Closing Date and December 31, 2015.  All Purchase Price adjustments pursuant to this Section 1.3 shall be net of any: (i) Federal income tax realized in respect of such adjustments; and (ii) reinsurance loss recoveries with respect to losses with loss dates prior to the Closing Date. The aggregate of all Purchase Price adjustments, whether positive or negative, will be capped at $500,000.00.

(a)     Closing Net Asset Value Adjustments.

(i)     Within 30 days after the Closing Date, Buyer shall prepare and deliver to Seller a statement setting forth the Closing Net Asset Value, which shall be accompanied by reasonable detail and related backup information.

(ii)     At such time as the Closing Net Asset Value shall become final in accordance with Section 1.3(c), it shall be compared to the Starting Net Asset Value. If the Closing Net Asset Value exceeds the Starting Net Asset Value by more than five percent (5.0%), Buyer shall be obligated to pay to Seller the entire amount of such excess, in cash in immediately available funds, on the date set forth in Section 1.2(b). If the Starting Net Asset Value exceeds the Closing Net Asset Value by more than five percent (5.0%), the Purchase Price payment to be made pursuant to Section 1.2(b) shall be reduced by the difference.

(b)     Adjustments for Net Loss Development.

(i)     By no later than January 31, 2016, Buyer shall prepare and deliver to Seller a statement setting forth the amount of the Net Loss Development, which shall be accompanied by reasonable detail and related backup information.

(ii)     The adjustment for the Net Loss Development shall be made at such time as the Net Loss Development shall become final in accordance with Section 1.3(c). If the Net Loss Development is a positive amount, the Purchase Price payment to be made pursuant to Section 1.2(b) shall be reduced by the amount of the Net Loss Development. If the Net Loss Development is a negative amount, Buyer shall be obligated to pay to Seller the amount of the Net Loss Development, in cash in immediately available funds, on the date set forth in Section 1.2(b).

(c)     Dispute Resolution Procedure.

(i)     Seller shall have 30 days from receipt of Buyer's calculations of the Closing Net Asset Value and the Net Loss Development to raise any objection(s) to Buyer's calculations by delivery of written notice to Buyer setting forth such objection(s) in reasonable detail (the "Disputed Items"). If Seller does

not deliver any such objection(s) within such 30-day period, then the resulting adjusted Purchase Price shall be deemed final for purposes of this 1.3. If any such objection(s) are so delivered, the resulting adjusted Purchase Price shall be deemed not final and Buyer and Seller shall attempt to resolve the Disputed Items in accordance with the procedures set forth in Article 11. In connection with the foregoing, the finder of fact shall be instructed to and must (i) limit its determination(s) only to the Disputed Items, and (ii) not assign a value to any Disputed Item greater than the highest value for such Disputed Item claimed by either Buyer or Seller or less than the lowest value for such Disputed Item claimed by either Buyer or Seller. All determinations by the fact finder shall be final and binding upon the parties for purposes of this 1.3, absent fraud or manifest error. The fees and expenses of the fact finder, if any, shall be borne by the party(ies) against whom the fact finder shall have substantially ruled.

(ii)    During the period that Seller and its advisors and representatives are conducting their review of Buyer's calculations of the Closing Net Asset Value and the Net Loss Development, the Seller and its advisors and representatives will have reasonable access during normal business hours to the records of the Companies and the calculations prepared by or on behalf of Buyer and its representatives in connection with Buyer's calculation of the Closing Net Asset Value and the Net Loss Development.

(iii)    Seller and Buyer acknowledge and agree that any payment or adjustment made pursuant to this 1.3 will be treated as an adjustment to the Purchase Price for income tax purposes.

1.4    The Closing. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Winstead PC, 401 Congress Avenue, Suite 2100, Austin, Texas 78701, commencing at 10:00 a.m. local time on the second business day following the satisfaction or waiver of all conditions to the obligations of the Parties to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective Parties will take at the Closing itself) or such other date and time as Buyer and the Seller may mutually determine (the "Closing Date").

1.5    Deliveries at the Closing. At the Closing, (a) Mirage will deliver to Buyer the various certificates, instruments, and documents referred to in Section 7.1, (b) Buyer will deliver to Seller the various certificates, instruments, and documents referred to in Section 7.2, (c) Mirage will deliver to Buyer stock certificates representing the Shares, duly endorsed to Buyer or accompanied by duly executed stock powers duly endorsed in blank, (d) any surplus note of RFIC may, at the discretion and direction of Buyer, be terminated or remain in place and (e) Buyer will deliver to Seller the Purchase Price in accordance with Section 1.2.

ARTICLE 2
REPRESENTATIONS AND WARRANTIES
OF MIRAGE

Mirage represents and warrants to Buyer, as of the Effective Date and as of the Closing (unless such representation or warranty is as of a specified date and then solely as of such date), as follows:

3

2.1     Capacity and Authorization of Mirage.  Mirage is an existing corporation with the requisite power and authority to execute and deliver this Agreement, and the other agreements contemplated herein, and to perform its obligations hereunder and thereunder.  This Agreement constitutes, and upon execution by the other Parties hereto will constitute, the valid and legally binding obligations of Mirage, enforceable in accordance with its terms and conditions, except as enforcement may be limited by general principles of equity, whether applied in a court of law or a court of equity, and by bankruptcy, insolvency, moratorium or other similar laws affecting creditors' rights and remedies generally.

2.2     Noncontravention.  Except as set forth in Section 2.2 of the Disclosure Schedule, to the Knowledge of Mirage, neither the execution and delivery of this Agreement, and the other agreements contemplated hereby, nor the consummation of the transactions contemplated hereby and thereby, will (i) violate any statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency or court to which Mirage is subject or its Governing Documents, or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any material agreement, contract, lease, license or instrument to which Mirage is a party or by which Mirage is bound or to which any of Mirage's assets is subject.  Except for the filings required by the Texas Department of Insurance ("TDI"), Mirage is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any government or governmental agency for the Parties to consummate the transactions contemplated by this Agreement.

2.3     Brokers' Fees.  Except for the fees payable to Merger & Acquisition Services, Inc. (the "Broker") listed in Section 2.3 of the Disclosure Schedule, which shall be paid on or before the Closing Date, neither Mirage nor the Companies has any Liability or obligation to pay any finder's fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Buyer or the Companies are or could become liable or obligated.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES
CONCERNING THE SHARES

Mirage represents and warrants to Buyer, as of the Effective Date and as of the Closing (unless such representation or warranty is as of a specified date and then solely as of such date), as follows:

3.1     Organization, Qualification, and Corporate Power.  RFIC, Spindletop and SSUGA are corporations duly incorporated, validly existing and in good standing under the laws of the State of Texas.  Each of the Companies is duly authorized to conduct business and is in good standing under the laws of each jurisdiction in which the Companies lease real property, maintain an office or have employees residing, except when the failure to be so qualified would not have a Material Adverse Effect.  Each of the Companies has the requisite corporate power and authority to carry on the businesses in which it is engaged and to own and use its properties as they are now owned and used.  Section 3.1 of the Disclosure Schedule lists the directors and officers of the Companies.

4

3.2     Capitalization.

(a)     The authorized capital stock of RFIC consists of 3,500,000 shares, par value $1.00 per share, consisting of 3,500,000 shares of Common Stock, of which 1,900,000 shares of Common Stock are issued and outstanding. All Shares are duly authorized, validly issued, fully paid and non-assessable, and are held of record and owned beneficially by Mirage.  Except as set forth in Section 3.2(a) of the Disclosure Schedule, there are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other contracts or commitments that require RFIC to issue, sell or otherwise cause to become outstanding any of its capital stock.   There are no outstanding stock appreciation rights, phantom stock or similar rights with respect to RFIC.   Except as set forth in Section 3.2(a) of the Disclosure Schedule, RFIC has no obligation of any kind to issue any additional Shares to any Person.  RFIC does not have any Subsidiary, and does not hold any material direct or indirect beneficial interest in any other corporation, partnership, joint venture or other entity or enterprise.

(b)     The authorized capital stock of Spindletop consists of 500,000 shares, par value $1.00 per share, consisting of 500,000 shares of Common Stock, of which 30,000 shares of Common Stock are issued and outstanding. All Shares are duly authorized, validly issued, fully paid and non-assessable, and are held of record and owned beneficially by Mirage.  Except as set forth in Section 3.2(b) of the Disclosure Schedule, there are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other contracts or commitments that require Spindletop to issue, sell or otherwise cause to become outstanding any of its capital stock. There are no outstanding stock appreciation rights, phantom stock or similar rights with respect to Spindletop.  Except as set forth in Section 3.2(b) of the Disclosure Schedule, Spindletop has no obligation of any kind to issue any additional Shares to any Person. Spindletop does not have any Subsidiary and does not hold any material direct or indirect beneficial interest in any other corporation, partnership, joint venture or other entity or enterprise.

(c)     The authorized capital stock of SSUGA consists of 1,000,000 shares, par value $1.00 per share, consisting of 1,000,000 shares of Common Stock, of which 1,273 shares of Common Stock are issued and outstanding.   All Shares are duly authorized, validly issued, fully paid and non-assessable, and are held of record and owned beneficially by Mirage.  Except as set forth in Section 3.2(c) of the Disclosure Schedule, there are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other contracts or commitments that require SSUGA to issue, sell or otherwise cause to become outstanding any of its capital stock. There are no outstanding stock appreciation rights, phantom stock or similar rights with respect to SSUGA.  Except as set forth in Section 3.2(c) of the Disclosure Schedule, SSUGA has no obligation of any kind to issue any additional Shares to any Person. SSUGA does not have any Subsidiary and does not hold any material direct or indirect beneficial interest in any other corporation, partnership, joint venture or other entity or enterprise.

3.3     Noncontravention.  Except as set forth in Section 3.3 of the Disclosure Schedule, to the Knowledge of Mirage, neither the execution and delivery of this Agreement, nor the

consummation of the transactions contemplated hereby, will (a) violate any statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency or court to which any of the Companies are subject or any provision of the Governing Documents of the Companies, or (b) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any material agreement, contract, lease, license or instrument to which any of the Companies is a party or by which any of the Companies are bound or to which any of the Companies' assets are subject (or result in the imposition of any Security Interest upon any of the Companies' assets). Except as specifically provided otherwise in this Agreement, an agreement, contract, lease, license or instrument shall be considered material for purposes of this Agreement only if it involves (i) executory performance of services or delivery of goods or materials to or by the Companies of an amount in excess of $250,000 and is not terminable by the Companies, or any other Person on 90 days' or less prior notice without liability, (ii) the future expenditure or receipt by the Companies in excess of $250,000, (iii) the lease, rental or occupancy of real or personal property involving the future expenditure by the Companies in excess of $250,000 in the current or any ensuing fiscal year, or (iv) any agreement pursuant to which the Companies licenses software or other intellectual property, other than commercially available software programs generally available to the public which have been licensed to the Companies pursuant to standard end-user licenses. Except for filings required by TDI or except as set forth in Section 3.3 of the Disclosure Schedule, none of the Companies are required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any government or governmental agency in order for the Parties to consummate the transactions contemplated by this Agreement, other than for such notices, filings, authorizations, consents or approvals, the failure of which to give or obtain would not result in a Material Adverse Effect.

3.4    Insurance Legal Compliance.   To the Knowledge of Mirage, all outstanding insurance Contracts issued, reinsured, or underwritten by RFIC or SSUGA are, to the extent required under Applicable Laws, on forms which were submitted to and approved by the insurance regulatory authority of the jurisdiction where such insurance Contracts were issued or delivered, or have been filed with and not objected to by such authority within the period provided for objection. The rates charged for insurance under the insurance Contracts issued by RFIC, or through SSUGA, as applicable, have been determined in accordance with usual and customary actuarial principles and practices.

3.5    Insurance Issued by RFIC and SSUGA.  Except as required by law or except as disclosed in Section 3.5 of the Disclosure Schedule, to the Knowledge of Mirage:

(a)    All insurance Contract benefits payable by RFIC to any other Person that is a party to or bound by any insurance, reinsurance, coinsurance, or other similar Contract with RFIC have in all material respects been paid in accordance with the terms of the insurance, reinsurance, coinsurance and other Contracts under which they arose, except for such benefits for which RFIC reasonably believes there is a reasonable basis to contest payment.

(b)    No outstanding insurance Contract issued, reinsured, or underwritten by RFIC entitles the holder thereof or any other Person to receive dividends, distributions, or to share in the income of RFIC or to receive any other benefits based on the revenues or earnings of RFIC or any other Person.

6

(c)     Each insurance agent, at the time such agent wrote, sold, or produced business for RFIC or SSUGA, was duly licensed as an insurance agent (for the type of business written, sold, or produced by such insurance agent) in the particular jurisdiction in which such agent wrote, sold, or produced such business for RFIC or SSUGA, as applicable.

(d)     No such insurance agent violated (or with or without notice or lapse of time or both, would have violated) any term or provision of any law or any writ, judgment, decree, injunction, or similar order applicable to the writing, sale, or production of business for RFIC or SSUGA, other than such violations as would not have a Material Adverse Effect.

3.6     Brokers' Fees.  Except for the fees payable to Broker, which shall be paid on or before the Closing Date, none of the Companies has any Liability or obligation to pay any finder's fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

3.7     Financial Statements; Liabilities.

(a)     Seller has made available to Buyer true and complete financial statements and all amendments thereto of Mirage and Affiliates, including the Companies, as audited by Plante & Moran, PLLC for the years ended December 31, 2012, 2011 and 2010, and the unaudited financial statements (the "Most Recent Financial Statements") as of and for the year ended December 31, 2013 and quarterly period ended June 30, 2014 (the "Most Recent Fiscal Period End"), together with all exhibits and schedules thereto (collectively, the "GAAP Statements"). Each of the GAAP Statements presents, in all material respects, the financial condition of Spindletop and SSUGA, at the respective dates thereof, and the results of operations for the periods then ended in accordance with General Accepted Accounting Principles ("GAAP"), applied on a consistent basis throughout the periods indicated except as otherwise specifically noted therein. Seller has also provided Buyer with financial statements and audits for RFIC for the same time periods which were prepared on Statutory Accounting Principles that provided an even more detailed analysis of RFIC.

(b)     There are no liabilities or obligations of the Companies required to be reflected as liabilities in financial statements prepared in accordance with GAAP other than (i) liabilities or obligations reflected or reserved against in the balance sheet for the Most Recent Fiscal Period End included in the June 30, 2014 GAAP Statements, not heretofore discharged, or (ii) policyholder benefits payable or other liabilities arising after June 30, 2014 in the Ordinary Course of Business and in amounts consistent with past practice, none of which has had or is reasonably likely to have, individually or in the aggregate, a Material Adverse Effect. All reserve liabilities reflected in the GAAP Statements were determined in accordance with commonly accepted actuarial standards consistently applied except as noted therein, were fairly stated in accordance with sound actuarial principles, met the requirements of the insurance laws of the State of Texas, and, in the aggregate, each other jurisdiction in which RFIC is licensed to write insurance and reflected or will reflect, as applicable, the related reinsurance, coinsurance and other similar agreements of RFIC.

7

(c)     RFIC has paid in full or established reserves reflected in the GAAP Statements and in its statutory financial statements filed with applicable regulatory authorities for all guaranty or other similar state governmental fund assessments required by any governmental entity to be paid by RFIC prior to the date of this Agreement. As of the Effective Date and except as and to the extent paid prior to June 30, 2014 or reserved against in the GAAP Statements, RFIC has not received any guaranty fund assessments.

3.8     Events Subsequent to Most Recent Fiscal Period End.  Since the Most Recent Fiscal Period End, except as (i) set forth in Section 3.8 of the Disclosure Schedule, (ii) permitted or contemplated by this Agreement, or (iii) consented to by Buyer in writing, there has not been:

(a)     any transaction entered into or carried out by the Companies other than in the Ordinary Course of Business;

(b)     any material borrowing or agreement to borrow funds by the Companies, other than in the Ordinary Course of Business; any incurring by the Companies of any other material obligation or liability (contingent or otherwise), except obligations and liabilities incurred in the Ordinary Course of Business; or any endorsement, assumption or guarantee of payment or performance of any material loan or obligation of any other Person by the Companies;

(c)     any material change in any of the Companies' methods of doing business or any material change in its accounting principles or practices or its method of application of such principles or practices;

(d)     any material mortgage, pledge, lien, Security Interest, hypothecation, charge or other encumbrance imposed or agreed to be imposed on or with respect to the properties or assets of the Companies, other than in the Ordinary Course of Business;

(e)     any material lien, mortgage, Security Interest, pledge, hypothecation, charge or other encumbrance of the Companies discharged or satisfied, or any obligation or liability (absolute or contingent) paid, other than in the Ordinary Course of Business and liabilities incurred and obligations under contracts entered into after the Most Recent Fiscal Period End, in the Ordinary Course of Business;

(f)     any sale, lease or other disposition of, or any agreement to sell, lease or otherwise dispose of, any of the material properties or assets of the Companies, other than sales of inventory in the Ordinary Course of Business;

(g)     any increase in the base or bonus compensation to any director, officer or employee of the Companies, whether now or hereafter payable or granted (other than payment of bonuses or increases in base or bonus compensation in the Ordinary Course of Business), or entry into or amendments of the terms of any employment or incentive agreement with any such person;

(h)     any issuance or sale of any equity securities of the Companies (other than the exercise of any outstanding option or warrant to purchase Shares or the conversion of capital securities of one class into a different class of capital securities of the Companies), or any alteration of any terms of any outstanding equity securities of the Companies; or

8

(i)      any declaration or payment of any dividend or distribution (whether in cash, stock or property or otherwise) in respect of any Shares of the Companies.

3.9      <u>Regulatory Filings</u>.  Seller has made available for inspection by Buyer all reports, statements, documents, registrations, filings and submissions made by or with respect to RFIC with any governmental entity, and reports of examinations issued by any such governmental entity since June 30, 2014.  RFIC has timely filed, or caused to be timely filed, all material reports, statements, documents, registrations, filings, applications or submissions required to be filed by or on behalf of RFIC with any governmental entity in connection with the business conducted by RFIC, RFIC is acting in compliance in all material respects with all such reports, statements, documents, registrations, filings, applications and submissions, and all required regulatory approvals in respect thereof are in full force and effect. All such reports, statements, documents, registrations, filings, applications and submissions were in compliance in all material respects with Texas law when filed or as amended or supplemented and there were no material omissions therefrom, and no material deficiencies have been asserted by any governmental entity with respect to such reports, statements, documents, registrations, filings, applications or submissions that have not been satisfied.

3.10     <u>Tax Matters</u>.  Except as set forth on Section 3.10 of the Disclosure Schedule:

(a)      Mirage has filed or caused to be filed all significant Tax Returns required to be filed with respect to the Companies.  All such Tax Returns at the time of filing complied with all applicable Tax laws in all material respects.  All Taxes owed by the Companies shown on any Tax Return have been paid or have been adequately accrued on the books and records of the Companies, as applicable.  Mirage and the Companies are currently the beneficiary of a filing extension of time for the 2013 Tax Return. Mirage and the Companies are not currently beneficiaries of any other extension of time for any other Tax Return.  There are no Security Interests on the assets of the Companies that arose in connection with any failure or alleged failure to pay any Tax.

(b)      There is no dispute or claim concerning any Tax Liability of the Companies (i) claimed or raised by any Taxing authority in writing, or (ii) as to which Mirage has Knowledge based upon personal contact with any agent of such authority. Mirage has made available to Buyer true and correct copies of all federal income Tax Returns filed with respect to the Companies with respect to periods ending on or after December 31, 2010.

(c)      None of the Companies has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(d)      Except as set forth in Section 3.10 of the Disclosure Schedule, none of the Companies is a party to any Tax allocation or sharing agreement.

(e)      Except as set forth in Section 3.10 of the Disclosure Schedule, no audit of any Company's federal income Tax Return is currently pending.

3.11     <u>Real Property</u>.

(a)      <u>Owned Real Property</u>. Section 3.11(a) of the Disclosure Schedule lists all real property owned by the Companies as of the date of this Agreement.

9

(b)      Leased Real Property.  Section 3.11(b) of the Disclosure Schedule lists all real property leased or subleased to or by the Companies and the leases or subleases in respect thereof.  Mirage has made available to Buyer true and correct copies of the leases and subleases listed in Section 3.11(b) of the Disclosure Schedule.

3.12   Title to Assets.  Except as described in Section 3.12 of the Disclosure Schedule, each of the Companies has good title to, or a valid leasehold interest in, all material tangible, personal property assets used regularly in the conduct of its business, including all fixtures, furniture, equipment, machinery and leasehold improvements (the "Fixed Assets"), subject to no material liens, mortgages, pledges, encumbrances or charges, except as described in Section 3.12 of the Disclosure Schedule or such other exceptions which are not material in character, amount or extent and do not materially detract from the value of or interfere with the use of the tangible assets subject thereto or affected thereby.  All Fixed Assets are in good condition and repair, ordinary wear and tear excepted, except where the failure to be maintained in such good condition and repair would not have a Material Adverse Effect.

3.13   Intellectual Property.  Section 3.13 of the Disclosure Schedule identifies each patent, trademark, trade name, copyright and application therefor owned or licensed by or to the Companies, and identifies each license, agreement or other permission which any of the Companies has granted to any third party with respect to any of the foregoing.  The Companies each own (or possess enforceable licenses or other rights to use) all material patents, trademarks, trade names, copyrights, inventions, formulas and processes necessary to the operation of its business as presently conducted and, to the Knowledge of Mirage, such present use does not conflict with the lawful rights of others in any material respect.  No proceedings are pending or, to the Knowledge of Mirage, threatened which challenge the validity or the ownership by the Companies of the patents, trademarks, trade names, copyrights and applications set forth in Section 3.13 of the Disclosure Schedule.  To the Knowledge of Mirage, the sale of the Companies' products and services does not result in a material infringement of any U.S. patent owned by a third party.

3.14   Contracts.  Section 3.14 of the Disclosure Schedule lists the following contracts and other agreements (other than those of a type disclosed in another Section to the Disclosure Schedule) to which any of the Companies is a party:

(a)      each contract, agreement or commitment in respect of the sale of products, insurance, reinsurance, coinsurance, or the performance of services, or for the purchase of inventories, equipment, raw materials, supplies, services or utilities which (i) involves payments or receipts by the Companies of $50,000 or more and is not terminable by the Companies at any time upon notice of 90 days or less, or (ii) is not to be fully performed within one year from the date of this Agreement;

(b)      any material agreement for the lease of personal property to or from any Person providing for lease payments in excess of $50,000 per annum;

(c)      each partnership, joint venture, joint operating or similar agreement;

(d)      indebtedness for borrowed money, or any capitalized lease obligation, in excess of $500,000 or under which it has imposed a Security Interest on any of its assets, tangible or intangible;

10

(e)     any agreement concerning confidentiality or noncompetition;

(f)     any material agreement with Seller or an Affiliate of Seller;

(g)     any deferred compensation, severance or other plan or arrangement for the benefit of its directors, officers and employees;

(h)     any collective bargaining agreement;

(i)     any agreement under which any of the Companies has advanced or loaned money to directors, officers or employees outside the Ordinary Course of Business; and

(j)     any agreement restricting the right of the Companies to do business anywhere in the world.

Mirage has delivered to Buyer a true and correct copy of each written agreement listed in Section 3.14 of the Disclosure Schedule and a written summary setting forth the terms and conditions of each oral agreement referred to therein.  With respect to each such agreement: (i) to the Knowledge of Mirage, no party thereto is in material breach or default, and no event has occurred which with notice or lapse of time would constitute a material breach or default, or permit termination, material modification or acceleration, under the agreement; (ii) no party has repudiated any material provision of the agreement; and (iii) to the Knowledge of Mirage, with respect to the Companies, the agreement is legally valid and binding, except as enforcement may be limited by general principles of equity, whether applied in a court of law or a court of equity, and by bankruptcy, insolvency, moratorium or other similar laws affecting creditors' rights and remedies generally.

3.15   Insurance.   Section 3.15 of the Disclosure Schedule sets forth the following information with respect to each insurance policy to which any of the Companies is a party, a named insured, or otherwise the beneficiary of coverage:

(a)     the name of the insurer, the name of the policyholder and the name (or group designation) of each covered insured; and

(b)     the policy number and the period of coverage.

With respect to each such insurance policy, to the Knowledge of Mirage, the Companies are not in material breach or default (including with respect to the payment of premiums), and no claim for coverage has been denied. None of the Companies has received any notice of cancellation or intent to cancel or notice of increase or intent to increase premiums in any significant respect with respect to such insurance policies.

3.16   Material Litigation.   Section 3.16 of the Disclosure Schedule sets forth each instance in which any of the Companies (a) is subject to any outstanding injunction, judgment, order, decree, ruling or charge of any court of competent jurisdiction (of other than general application), or (b) is a party or, to the Knowledge of Mirage, is threatened in writing to be made a party, to any action, suit, proceeding, hearing or investigation of, in or before any court or administrative agency of any federal, state, local or foreign jurisdiction or before any arbitrator, seeking either (i) injunctive or similar relief, or (ii) damages in excess of $250,000.  There is no claim, litigation, action, arbitration, suit, or judicial proceeding pending or, to the Knowledge of

11

Mirage, threatened in writing, nor any governmental investigation pending or to the Knowledge of Mirage threatened in writing, against any of the Companies, at law or equity, before any federal, state or local court or regulatory agency, or other governmental authority, which is reasonably likely to have a Material Adverse Effect.

3.17    Labor and Employment Matters.

(a)    The Companies are in compliance in all material respects with all Applicable Laws respecting employment and employment practices and terms and conditions of employment, other than such noncompliance as would not have a Material Adverse Effect.

(b)    No union representation exists with respect to the employees of the Companies and, to the Knowledge of Seller, no union organizing activities are currently taking place.

(c)    Set forth in Section 3.17(c) of the Disclosure Schedule is a list of all the current employees of each of the Companies.

3.18    Employee Benefits.   Except as set forth in Section 3.18 of the Disclosure Schedule, none of the Companies is obligated under or a party to any profit-sharing, deferred compensation, bonus, equity option, equity ownership, equity purchase, phantom stock, pension, multiemployer, employment, consulting, retirement, welfare, cafeteria or incentive plan, or any plan or agreement or practice providing for "fringe benefits" to its employees or former employees, including, but not limited to, vacation, sick leave, salary continuation, service awards, severance pay, welfare, medical, post-retirement medical, hospitalization, disability, life insurance, other insurance plans, or related benefits.   None of the Companies is a member of a controlled group of companies or a controlled group of trades or businesses as described in Section 414(b) and 414(c), respectively, of the Code, or Section 4001 of ERISA.   Except as set forth in Section 3.18 of the Disclosure Schedule, (a) each employee benefit plan and any trust maintained in connection therewith, intending to qualify under Sections 401 and 501 of the Code so qualifies, and to the Knowledge of Mirage no event has occurred which would cause such plan or trust to fail to qualify under Sections 401 and 501 of the Code, (b) there are no actions, suits or claims (other than routine claims for benefits in the ordinary course) pending or, to the Knowledge of Mirage, threatened with respect to any such plans, which could have a Material Adverse Effect, or such plan, and (c) each of the Companies has complied in all material respects with the administration, reporting and substantive requirements of ERISA and the Code with respect to each of such plans.

3.19    Guaranties.   Except as set forth in Section 3.19 of the Disclosure Schedule, none of the Companies is a guarantor for any Liability or obligation (including indebtedness) of any other Person.

3.20    Environment, Health and Safety.   Except as set forth in Section 3.20 of the Disclosure Schedule, to the Knowledge of Mirage:

(a)    The Companies have been, and currently are, in compliance in all material respects with all Environmental, Health and Safety Laws, and there is no contingent liability relating to any Environmental, Health and Safety Laws, except for any such noncompliance or liability that would not have a Material Adverse Effect.

12

(b)     No action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand or notice has been filed or commenced or threatened against the Companies alleging a failure to comply with Environmental, Health, and Safety Laws.

3.21    <u>Certain Business Relationships with the Companies</u>.   Except as described in Section 3.21 of the Disclosure Schedule, neither Seller nor its Affiliates has been involved in any material business arrangement or relationship with the Companies within the past 12 months and neither Seller nor its Affiliates (other than the Companies) owns any material asset, tangible or intangible, which is used in the business of the Companies.

3.22    <u>Stock Records</u>.   The stock or membership interest books and records of the Companies accurately reflect all transactions in the capital securities of the Companies since their respective dates of incorporation.

3.23    <u>Labor Relations</u>.   To the Knowledge of Mirage, (i) there is no unfair labor practice complaint against any of the Companies pending before any governmental authority, and (ii) there is no labor strike, dispute, slowdown or stoppage, or any union-organizing effort or campaign, pending against or involving any of the Companies.

3.24    <u>Customers</u>.   Except as set forth in Section 3.24 of the Disclosure Schedule, to the Knowledge of Mirage none of the Companies' material customers have given written notice to any of the Companies that any material contracts or orders will be terminated or canceled prior to their expiration date.

3.25    <u>Licenses and Permits</u>.   Section 3.25 of the Disclosure Schedule sets forth a true, complete and accurate list of all licenses, approvals, permits or authorizations from governmental authorities required to be maintained for the businesses and operations of the business of the Companies.

ARTICLE 4
REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller, as of the Effective Date and as of the Closing (unless such representation or warranty is as of a specified date and then solely as of such date), as follows:

4.1     <u>Organization of Buyer</u>.   Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Florida and is duly qualified to do business in each jurisdiction in which Buyer owns or leases any property, maintains an office or has employees residing, except where the failure to be so qualified would not have a Material Adverse Effect on the business or financial condition of Buyer.

4.2     <u>Authorization of Buyer</u>.   Buyer has the requisite corporate power and authority to execute and deliver this Agreement, and the other agreements contemplated herein, and to perform its obligations hereunder and thereunder.  This Agreement, and the other agreements contemplated herein, have been duly authorized by all requisite corporate action of Buyer and constitutes, and upon execution by the other Parties hereto and thereto, will constitute, the valid and legally binding obligations of Buyer, enforceable in accordance with its terms and conditions, except as enforcement may be limited by general principles of equity, whether

13

applied in a court of law or a court of equity, and by bankruptcy, insolvency, moratorium or other similar laws affecting creditors' rights and remedies generally.

4.3     Noncontravention.  Neither the execution and delivery of this Agreement, and the other agreements contemplated hereby, nor the consummation of the transactions contemplated hereby and thereby, will (i) violate any statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency or court to which Buyer is subject or any provision of its Governing Documents, or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any agreement, contract, lease, license or instrument to which Buyer is a party or by which it is bound or to which any of its assets is subject.  Except for the filings required by the TDI, Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any government or governmental agency for the Parties to consummate the transactions contemplated by this Agreement.

4.4     Brokers' Fees.  Buyer has no Liability or obligation to pay any finder's fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Seller could become liable or obligated.

4.5     Investment Representations.

(a)     Buyer acknowledges that the Shares have not been registered for offer or sale under the Securities Act or any state securities laws, are not listed for trading on any stock exchange, stock quotation service or other stock market and are not part of a class of securities registered under the Exchange Act.  Buyer understands that the Shares (A) are being sold to Buyer in reliance on exemptions from the registration requirements of the Securities Act and any applicable state securities laws; (B) are "restricted securities" within the meaning of Rule 144 promulgated under the Securities Act; and (C) may not be sold, transferred or otherwise disposed of unless subsequently registered under the Securities Act and applicable state securities laws or unless an exemption from registration is available.

(b)     Buyer has such knowledge and experience in financial and business matters in general and with respect to businesses of a nature similar to the business of the Companies so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, the acquisition of the Shares.  Buyer is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act.

(c)     Buyer is acquiring the Shares solely for its own account and not with a view to or for resale in connection with any distribution or public offering thereof, within the meaning of applicable securities laws and regulations.

(d)     To the extent it believes appropriate prior to the signing of this Agreement, Buyer (A) has received all the information it has deemed necessary to make an informed investment decision with respect to the execution of this Agreement and the acquisition of the Shares; (B) has had the opportunity to conduct adequate due diligence and review the information provided or made available to it by Seller; (C) has had the unrestricted opportunity to make such investigation as it has desired pertaining to the

14

Companies and the acquisition of the Shares and to verify the information that is, and has been made, available to it; and (D) has had the opportunity to ask questions of Seller regarding the business operations and financial condition of the Companies.

4.6     <u>Financing</u>.   Buyer has sufficient funds available, through firm financing commitments or otherwise, to purchase the Shares pursuant to this Agreement without violating any solvency requirements currently applicable to Buyer.  Buyer has previously supplied to Seller its bank statements dated as of a date not earlier than June 30, 2014.

4.7     <u>Absence of Litigation</u>.  Buyer is not a party to any, and there are no pending or threatened proceedings against, Buyer challenging the validity of the transactions contemplated by this Agreement which, if determined adversely, would prevent the consummation of the transactions contemplated by this Agreement.

4.8     <u>No Knowledge of Misrepresentations or Omissions</u>.  Buyer has no knowledge that any of the representations and warranties of Seller in this Agreement and the Disclosure Schedule are untrue or incorrect in any material respect, and Buyer has no knowledge of any material errors in, or material omissions from, the Disclosure Schedule.

4.9     <u>No Other Representations</u>.  Buyer acknowledges and agrees that it has conducted its own independent review and analysis of (i) the Shares; and (ii) the business, assets, condition, operations and prospects of the Companies.  In entering into this Agreement, Buyer has relied solely upon its own investigation and analysis and the representations and warranties of Seller set forth in this Agreement, and Buyer acknowledges that, other than as set forth in Article 2 and Article 3 of this Agreement, neither Seller nor any of the Companies nor any of their respective directors, officers, employees, Affiliates, stockholders, agents or representatives makes or has made any representation or warranty, either express or implied, as to the Shares, or as to the Companies or their assets and properties, the results of their operations, their liabilities, the conduct of their respective businesses, the accuracy or completeness of any of the information (including, without limitation, projections, forecasts, budgets and estimates) provided or made available to Buyer, its officers, directors, employees, agents, representatives, Affiliates and financing sources prior to the execution of this Agreement.  Specifically, Buyer shall not be entitled to rely on, or seek damages for Adverse Consequences under Article 8 or otherwise, for any information provided to Buyer or its representatives, Affiliates or financing sources by any Affiliate, stockholder or representative of Seller that is not expressly set forth in Article 2 or Article 3 of this Agreement or in the Disclosure Schedules.

ARTICLE 5
PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the Effective Date and the Closing:

5.1     <u>General; Timing of Closing</u>.  Each of the Parties will use Reasonable Best Efforts to take all action and to do all things necessary to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth in Article 7).  Each of the Parties will use Reasonable Best Efforts to cause the satisfaction of all closing conditions set forth in Article 7 on or before November 16, 2014.

15

5.2     Notices and Consents.  Seller will cause the Companies to give any notices to third parties and to use its Reasonable Best Efforts to obtain any third party consents that are required pursuant to the terms of any material agreement or contract listed in Section 3.14 of the Disclosure Schedule.  Buyer and Seller will give any notices, make any filings with, and use their Reasonable Best Efforts to obtain any authorizations, consents and approvals of governments and governmental agencies in connection with the matters referred to in Section 2.22, Section 3.3 and Section 4.3.  Without limiting the generality of the foregoing, Buyer and Seller each will promptly make all required filings, if applicable, as required by the TDI.  In the event that a request for additional information is made of Buyer or Seller pursuant to the Texas Insurance Code, Buyer or Seller, as the case may be, shall use Reasonable Best Efforts (and Mirage will cause RFIC to use Reasonable Best Efforts) to comply with such request as soon as practicable after receipt of such request.

5.3     Operation of Business.  Seller will not cause or permit the Companies to (i) change or amend their Governing Documents, (ii) merge or consolidate with any other Person or acquire a material amount of assets of any other Person, or (iii) enter into any transaction outside the Ordinary Course of Business.

5.4     Preservation of Business.  Seller will cause the Companies to (a) use Reasonable Best Efforts to keep their respective businesses and properties substantially intact, including their present operations, physical facilities, working conditions and relationships with lessors, licensors, suppliers, customers and employees, and (b) conduct the business, operations, activities and practices of the Companies in the Ordinary Course of Business (except to the extent otherwise contemplated or permitted by this Agreement).

5.5     Full Access.  Prior to the Closing, Mirage will cause the Companies to permit Buyer and its attorneys, accountants and representatives to have full access on an ongoing basis, and as requested by Buyer upon reasonable notice to Mirage during normal business hours, but only in a manner so as not to interfere with the normal business operations of the Companies, to the premises, properties, personnel, books, records, contracts and documents of or pertaining to the Companies.  Seller shall use commercially reasonable efforts to ensure that the information and access provided is accurate, current and updated at the time such information and access is provided, and shall permit Buyer and its attorneys, accountants and representatives to consult with and ask questions of the officers, directors, employees, vendors, accountants, agents, consultants and representatives of Mirage and/or the Companies; provided, however, that Buyer shall be required to be accompanied by a representative of Mirage, or the Companies, as the case may be, at all times upon the Companies' premises.  Mirage will cause the Companies to also cooperate with and assist Buyer in discussions with insurance and other regulators regarding the condition of the Companies and compliance with insurance laws and regulations.  Buyer will comply with the terms and conditions of the Non-Disclosure Agreement with respect to any Confidential Information (as defined in the Non-Disclosure Agreement) received from Mirage or the Companies in the course of the reviews contemplated by this Section 5.5 and will not use any such Confidential Information except in connection with this Agreement or as permitted by the Non-Disclosure Agreement, and, if this Agreement is terminated for any reason whatsoever, Buyer will return accordingly to Mirage and/or the Companies, or destroy (and upon request certify such destruction in writing to Mirage or the Companies) all tangible embodiments (and all copies) of the Confidential Information which are in its possession.  In the event of any conflict between the terms of this Section 5.5 and the Non-Disclosure Agreement, the terms of this Agreement will be controlling.

16

5.6     Notice of Developments.  Each Party will give prompt written notice to the other of any development causing a material breach of any of its representations and warranties in Articles 2, 3 or 4.  No disclosure by a Party pursuant to this Section 5.6, however, shall be deemed to amend or supplement the Disclosure Schedule or to prevent or cure any misrepresentation, breach of warranty or breach of covenant, except to the extent included in one or more Disclosure Schedule Updates contemplated by Section 5.7 and accepted or deemed accepted by Buyer pursuant thereto.

5.7     Disclosure Schedule Update.

(a)     At any time prior to the Closing, Mirage may deliver to Buyer one or more amendments or supplements to the Disclosure Schedule (each a "Disclosure Schedule Update") to correct any matter or matters that Seller becomes aware of (either on its own or by being informed by Buyer) that would constitute a breach of any representations or warranties contained in Articles 2 or 3 hereof.  Unless Buyer reasonably and in good faith believes any Disclosure Schedule Update reflects new or changed information that indicates a Material Adverse Effect, and chooses not to accept the Disclosure Schedule Update by giving written notice of such non-acceptance to Seller within the first to occur of (i) the expiration of two (2) business days of receipt of the Disclosure Schedule Update, or (ii) the Closing Date, Buyer shall be deemed to have accepted and acknowledged the Disclosure Schedule Update, and for all purposes under this Agreement the Disclosure Schedule Update shall be deemed to supersede and amend the pertinent portion so supplemented and amended of the original Disclosure Schedule dated as of the Effective Date (and all references herein to the Disclosure Schedule shall mean the Disclosure Schedule as amended and supplemented pursuant to this Section 5.7(a)).

(b)     If Buyer reasonably and in good faith believes the Disclosure Schedule Update reflects new or changed information that indicates a Material Adverse Effect, and Buyer provides written notice to Seller within the time period prescribed in Section 5.7(a), Buyer may elect to terminate this Agreement if and to the extent permitted by Section 12.1(b) hereof.

(c)     If, at any time up to and including the Closing Date, Buyer has knowledge that (i) any representation or warranty being made herein or at Closing by Seller is misleading, untrue or incorrect or (ii) Seller has not performed or complied in any material respect with any agreements or covenants required by this Agreement to be performed or complied with by Seller, then Buyer shall promptly give written notice to Seller setting forth with reasonable specificity the matter alleged to be misleading, untrue or incorrect or the matter that has not been performed or complied with.  Such notification shall be given as soon as reasonably practicable after Buyer has knowledge that notice hereunder is required.  If the required notice is not given by Buyer, then all such matters of which Buyer has knowledge shall be deemed waived irrevocably for all purposes under this Agreement and no claim whatsoever, whether for indemnification under this Agreement, or for damages or otherwise, may be made by Buyer against Seller as a consequence of a breach of such representation or warranty or the failure to perform or comply with such agreement or covenant.

5.8     Compensation Arrangements.  Except as otherwise contemplated or permitted by this Agreement or as set forth in Section 5.8 of the Disclosure Schedule, Mirage shall not permit

17

any of the Companies to enter into or materially modify any employee arrangements, grant bonuses, increase salaries or improve severance or termination pay, except in the Ordinary Course of Business.

    5.9    <u>Employees; Consultants</u>.

    (a)    Immediately prior to the Closing, Mirage shall cause each of the Companies to terminate the employees listed on Section 5.9(a) of the Disclosure Schedule, effective as of the Closing.

    (b)    Buyer, or an Affiliate, shall offer an employment contract substantially in the form of <u>Exhibit A</u> to the employees of Seller listed on Section 5.9(b) of the Disclosure Schedule.

    (c)    At Closing, Buyer will make a cash contribution to the Simplified Employee Pension program for those employees listed on Section 5.9(c) of the Disclosure Schedule in amounts to be equal to five percent (5.0%) of each such employee's base salary immediately prior to Closing.

    (d)    If Buyer determines, in its sole discretion, that it requires such services, Buyer and Seller shall execute and deliver a Consulting Agreement at Closing in a form to be agreed upon by the Parties between the Effective Date and the Closing Date.

    5.10    <u>Office Lease</u>.  At Closing, Mirage will terminate the lease agreement with Beaumont Preservation Partners, LLC, and Buyer shall enter into an office lease with Beaumont Preservation Partners, LLC substantially similar to the lease form which is attached hereto and acknowledged by the Parties (the "<u>Lease</u>") for the office space currently occupied by the Companies, and the Lease will include the right to use certain furniture and equipment owned by Mirage and Affiliates to be described therein.

ARTICLE 6
<u>POST-CLOSING COVENANTS</u>

The Parties agree as follows with respect to the period following the Closing:

    6.1    <u>General</u>.  If at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will take, or cause to be taken, such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under Article 8). Seller acknowledges and agrees that from and after the Closing, Buyer will be entitled to possession of all documents, books, records, agreements and financial data relating to the Companies; provided, however, that after Closing upon request Buyer shall cause the Companies to provide Seller with true, complete and correct copies of any of the foregoing at the respective Company's sole expense for any proper purpose (including preparation of Tax Returns and responding to any audits by Taxing authorities).

    6.2    <u>Indemnification</u>.  Buyer shall cause the Companies to keep in effect provisions in their respective Governing Documents with respect to indemnification no less favorable to directors and officers than those contained therein on the Effective Date, which provisions shall

18

not be amended, repealed or otherwise modified for a period of at least six years from the Closing in any manner that would adversely affect the rights thereunder of individuals who at any time prior to the Closing were directors or officers of the Companies in respect of actions or omissions at or prior to the Closing (including the transactions contemplated by this Agreement), except as required by applicable law.

6.3    Mutual Cooperation.

(a)    Tax Returns for Periods Ending on or Prior to Closing Date, Filed After Closing Date.  Seller shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for the Companies for all periods ending on or prior to the Closing Date, including the 2014 stub period, which are to be filed after the Closing Date.  Buyer shall be permitted to review, comment and approve each such Tax Return described in the preceding sentence prior to filing, which approval Buyer will not unreasonably withhold.  All such Tax Returns shall be prepared in a manner consistent with the past custom and prior practice of the Companies unless specifically required by Applicable Law.

(b)    Tax Periods Beginning After the Closing Date.  Buyer shall prepare or cause to be prepared and file or cause to be filed any Tax Returns of the Companies for tax periods which begin after the Closing Date.  Seller shall be permitted to review, comment and approve any portion of each such Tax Return related to taxable periods ending on or prior to the Closing Date prior to filing, which approval Seller will not unreasonably withhold or delay.  For purposes of this Section, in the case of any Taxes that are imposed on a periodic basis and are payable for a taxable period that includes (but does not end on) the Closing Date, the portion of such Tax that relates to the portion of such taxable period ending on the Closing Date shall (i) in the case of any Taxes other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in the entire taxable period, and (ii) in the case of any Tax based upon or related to income or receipts be deemed equal to the amount which would be payable if the relevant taxable period ended on the Closing Date.  Any credits relating to a taxable period that begins before and ends after the Closing Date shall be taken into account as though the relevant taxable period ended on the Closing Date.  All determinations necessary to give effect to the foregoing allocations shall be made in a manner consistent with past custom and prior practice of the Companies.

(c)    Cooperation on Tax Matters.

(i)    Seller shall cooperate fully and Buyer shall cause the Companies to cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns pursuant to this Section and any audit, litigation or other proceeding with respect to Taxes.  Such cooperation shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  Buyer agrees to retain all books and records with respect to Tax matters pertinent to the Companies relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations

19

(and any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority.

(ii)     Buyer and Seller further agree, upon request, to provide the other Party with all information that either Party may be required to report pursuant to the Code and all Treasury Department Regulations promulgated thereunder.

(d)     Refunds; Tax Benefits; Tax Liabilities.  If any Tax refunds that are received by Buyer or the Companies, or any amounts credited against Taxes to which Buyer or the Companies become entitled, that relate to Tax periods or portions thereof ending on or before the Closing Date exceeds the portion, if any, of such refunds or credited amounts that were included as assets receivable in the Most Recent Financial Statements, Buyer shall pay over to Mirage any such excess, within fifteen (15) days after receipt or entitlement thereto, net of any Taxes imposed upon Buyer by reason of the receipt of such excess. If any Tax liabilities that are imposed upon Buyer or the Companies, or any amounts assessed against Taxes to which Buyer or the Companies become obligated, that relate to Tax periods or portions thereof ending on or before the Closing Date exceeds the portion, if any, of such liabilities or assessments that were included as taxes payable in the Most Recent Financial Statements, Mirage shall pay over to Buyer any such excess, within fifteen (15) days prior to the due date thereof.  The parties intend that any payments from Buyer to Seller, or amounts due from Seller to Buyer, under this Section 6.3(d) shall be treated as an adjustment to the Purchase Price of the Shares for purposes of all applicable Laws, including Tax Laws.

(e)     Tax Audits.  Buyer agrees (i) to furnish to Mirage copies of all correspondence received from any governmental entity in connection with any audit, litigation or other proceedings relating to the Tax Returns of the Companies for taxable periods beginning prior to the Closing Date, and (ii) to cooperate, to the extent reasonably requested by Mirage, in connection with any audit, litigation or other proceedings in respect to the Taxes of the Companies. Mirage, in its sole discretion, shall have the right to participate in or control any audit, examination, litigation or other proceedings by any governmental entity and contest and defend against any assessment, notice of deficiency or other adjustment or proposed adjustment relating to or with respect to Taxes or Tax Returns for any period ending on or prior to the Closing Date and shall have full control over the resolution or settlement of any such matters; provided, however, that in the event that any such adjustment would have an adverse effect on the Companies for a period ending after the Closing Date, Mirage (i) shall permit Buyer to participate in the proceeding to the extent the adjustment may affect the Tax liability of the Companies for a period ending after the Closing Date, and (ii) shall not settle or otherwise compromise such proceeding without the prior written consent of Buyer, which shall not be unreasonably withheld or delayed.  To the extent Mirage does not assume full control over any such matters, Buyer shall use best efforts to defend positions taken on Tax Returns for periods ending on or prior to the Closing Date and shall keep Mirage informed of the progress of any such proceedings and shall not settle or otherwise compromise such proceeding without the prior written consent of Mirage, which shall not be unreasonably withheld or delayed.  To the extent that any assessment, notice of deficiency or other adjustment or proposed adjustment related to or with respect to the Tax Returns for any taxable period other than a period ending on or prior to the Closing Date would require indemnification hereunder, Buyer (A) shall permit Mirage to

participate in the proceeding, and (B) shall not settle or otherwise compromise such proceeding without the prior written consent of Mirage, which shall not be unreasonably withheld or delayed.

## ARTICLE 7
## CONDITIONS TO OBLIGATION TO CLOSE

7.1     Conditions to Obligation of Buyer.  The obligation of Buyer to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(a)     (i) The representations and warranties of Seller contained in this Agreement that are qualified as to Material Adverse Effect shall be true and correct as of the date of this Agreement and as of the Closing Date (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made; and (ii) the representations and warranties of Seller contained in this Agreement that are not qualified as to Material Adverse Effect shall be true and correct as of the date of this Agreement and as of the Closing Date (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made, except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. If Seller shall have delivered one or more Disclosure Schedule Updates and Buyer has not terminated this Agreement in accordance with Section 12.1(b), such Disclosure Schedule Update(s) will be deemed to modify the Disclosure Schedule and the disclosures therein will be given effect for purposes of determining the accuracy of Seller's representations and warranties;

(b)     Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(c)     Seller shall have delivered to Buyer a certificate to the effect that each of the conditions specified in Sections 7.1(a) and (b) have been satisfied;

(d)     no action, suit, or proceeding shall be pending or, to the Knowledge of Seller, threatened in writing before any federal or state court of competent jurisdiction wherein an unfavorable injunction, judgment, order, decree, ruling or charge has been or is reasonably likely to be issued (i) preventing consummation of the transactions contemplated by this Agreement, or (ii) causing the transactions contemplated by this Agreement to be rescinded following consummation;

(e)     all required TDI filings, including but not limited to approval of the Form A for RFIC, shall have been made and any applicable waiting period (and extensions thereof) under the Texas Insurance Code shall have expired or terminated;

(f)     there has not been a Material Adverse Effect with respect to Seller or the Companies;

21

(g)     the Secretary of each of the Companies shall have delivered to Buyer a certificate, dated as of the Closing Date, certifying as to its (i) Certificate of Incorporation; and (ii) Bylaws; and

(h)     all other material governmental approvals or consents, if any, required by Applicable Law, and all applicable third party consents, if any, required under any material contract to which any of the Companies is a party identified in Section 3.14 of the Disclosure Schedule, for the consummation of the transactions contemplated by this Agreement, shall have been received, satisfied or waived.

Buyer may waive any condition specified in this Section 7.1 if it executes a writing so stating at or prior to the Closing.

7.2     Conditions to Obligation of Seller.   Seller's obligation to consummate the transactions to be performed by Seller in connection with the Closing is subject to satisfaction of the following conditions:

(a)     (i) The representations and warranties of Buyer contained in this Agreement that are qualified as to Material Adverse Effect shall be true and correct as of the date of this Agreement and as of the Closing Date (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made; and (ii) the representations and warranties of Buyer contained in this Agreement that are not qualified as to Material Adverse Effect shall be true and correct as of the date of this Agreement and as of the Closing Date (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made, except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Buyer;

(b)     Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(c)     Buyer shall have delivered to Seller a certificate executed by a senior executive officer of Buyer to the effect that each of the conditions specified in Sections 7.2(a) and (b) have been satisfied;

(d)     no action, suit, or proceeding shall be pending before any federal or state court of competent jurisdiction wherein an unfavorable injunction, judgment, order, decree, ruling or charge has been or is reasonably likely to be issued (i) preventing consummation of the transactions contemplated by this Agreement, or (ii) causing any of the transactions contemplated by this Agreement to be rescinded following consummation; and

(e)     all required TDI filings, including but not limited to approval of the Form A for RFIC, shall have been made and any applicable waiting period (and extensions thereof) under the Texas Insurance Code shall have expired or terminated.

Seller may waive any condition specified in this Section 7.2 if Seller executes a writing so stating, at or prior to the Closing.

## ARTICLE 8
## INDEMNIFICATION

8.1     Survival of Representations and Warranties.  Subject to Article 9 and Article 10, all covenants, agreements, representations and warranties made by Seller and Buyer pursuant to this Agreement shall be deemed to have survived the Closing and shall remain effective.

8.2     Indemnification Provisions for Benefit of Buyer.  Subject to Article 9 and Article 10, following the Closing, Seller shall indemnify and save and hold Buyer harmless from and against any Adverse Consequences suffered or incurred by Buyer (provided that Seller's obligations hereunder shall be subject to the limitations set forth in Article 9) arising out of or resulting from:

(a)     the inaccuracy in any representation or the breach of any warranty made by Seller in this Agreement; or

(b)     the failure of Seller duly to perform or observe any covenant or agreement in this Agreement required on the part of Seller to be performed or observed by it pursuant to this Agreement.

8.3     Indemnification Provisions for Benefit of Seller.  Following the Closing, Buyer shall indemnify, save and hold harmless Seller from and against any Adverse Consequences suffered or incurred by Seller arising out of or resulting from:

(a)     the inaccuracy  in any representation or the breach of any warranty made by Buyer in this Agreement; or

(b)     the failure of Buyer duly to perform or observe any covenant or agreement in this Agreement required on the part of Buyer to be performed or observed by it pursuant to this Agreement.

8.4     Exclusive Remedy.  This Article 8, as limited by the provisions of Article 9 and Article 10, constitutes the Buyer's and Seller's sole and exclusive remedy for all Adverse Consequences or other claims (excluding any actions for specific performance) relating to or arising from this Agreement, any of the agreements, documents and instruments executed and delivered in connection herewith and the transactions contemplated by any of the foregoing. Neither the Buyer nor the Seller may avoid such limitation on liability by seeking damages for breach of contract, tort or pursuant to any other theory of liability, other than claims based on fraud.  Except as otherwise provided in this Section 8.4 or for claims based on fraud, no claim shall be brought or maintained by Buyer or its Affiliates, successors or permitted assigns against Seller, its successors or permitted assigns and no recourse shall be brought or granted against Seller, by virtue of or based upon any alleged misrepresentation or inaccuracy in or breach of any of the representations, warranties or covenants of Seller or any other Person set forth or contained in this Agreement, or any of the agreements, documents and instruments executed and delivered in connection herewith or therewith, the subject matter of this Agreement, any information, document or material furnished or made available to Buyer in "data rooms," management presentations or in any other form in anticipation of or in connection with the

23

transactions contemplated by this Agreement, the ownership, operation, management, use, control of, and other actions or omissions with respect to, the business of the Companies, any of their assets, any of the transactions contemplated hereby or any other actions or omissions at or prior to the Closing Date.  Buyer and its Affiliates, successors and permitted assigns hereby irrevocably waive all such claims of any type or description and hereby agree to indemnify and hold harmless Seller from and against and in respect of all Adverse Consequences and other losses incurred by Seller as a result of any such claim brought or maintained by any such party against Seller in contravention of this Section 8.4.  EACH PARTY EXPRESSLY WAIVES ALL RIGHTS AFFORDED BY ANY STATUTE WHICH LIMITS THE EFFECT OF A RELEASE WITH RESPECT TO UNKNOWN CLAIMS. EACH PARTY UNDERSTANDS THE SIGNIFICANCE OF THIS RELEASE OF UNKNOWN CLAIMS AND WAIVER OF STATUTORY PROTECTION AGAINST A RELEASE OF UNKNOWN CLAIMS.  EACH PARTY ACKNOWLEDGES AND AGREES THAT THIS WAIVER IS AN ESSENTIAL AND MATERIAL TERM OF THIS AGREEMENT.  For purposes of this Agreement, Adverse Consequences from "fraud" shall not be deemed to have been suffered or incurred by Buyer unless such Adverse Consequences were caused by a representation and warranty of Seller in this Agreement that was (a) false, (b) positively asserted with the Knowledge of the Seller of its falsity when made, (c) made by Seller with the intent that it be acted upon by Buyer, and (d) relied upon by Buyer.

## ARTICLE 9
## LIMITATIONS ON INDEMNIFICATION

9.1     Term.

(a)     Any rights of Buyer to indemnification under this Agreement (including under Section 8.2) shall apply only to those claims written notice of which shall have been delivered by Buyer to Seller on or before 12 months from the Closing Date.

(b)     Any rights of Seller to indemnification under this Agreement (including under Section 8.3) shall apply only to those claims written notice of which shall have been delivered by Seller to Buyer on or before 12 months from the Closing Date.

(c)     Notwithstanding anything in this Article 9 to the contrary, (i) the representations and warranties contained in Section 3.2 (Capitalization) shall survive indefinitely, and (ii) the covenants of the Parties shall survive according to their respective terms.

9.2     Indemnification Basket.  Any right of Buyer to indemnification under this Agreement shall not apply to any claim until the aggregate of all such claims which have become final totals at least $40,000 in which event such indemnity shall apply to all such claims which become final.  This requirement shall not be deemed to be a deductible against the amount of damages that may be recovered and any such damages shall be recoverable on a first dollar basis.

9.3     Limited Recourse.  Notwithstanding anything to the contrary in this Agreement, all rights of Buyer to indemnification by Seller under this Agreement (including under Section 8.2) shall be limited to the maximum amount of the Purchase Price adjustment of $500,000.00 as described in Section 1.3.

24

## ARTICLE 10
## COOPERATION

10.1     Notice of Claims.  Each Party will give prompt written notice to the other Parties of any claim by a third party or by any governmental body, or any legal, administrative or arbitration proceeding ("Third Party Claim") which such Party ("Indemnified Party") discovers or of which it receives notice after the Closing and which may give rise to a claim against any other Party or Parties ("Indemnifying Party") under Sections 8.2 or 8.3, as the case may be.  All notices shall state in reasonable detail the nature, basis and amount (to the extent reasonably ascertainable) of such Third Party Claim.  No delay on the part of the Indemnified Party in notifying the Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder unless (and then, subject to this Article 10, solely to the extent) the Indemnifying Party thereby is prejudiced.

10.2     Right to Defense.

(a)     The Indemnifying Party shall have the right to defend the Indemnified Party against the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party so long as the Indemnifying Party notifies the Indemnified Party in writing within fifteen (15) days after the Indemnified Party has given notice of the Third Party Claim that the Indemnifying Party will, subject to the limitations set forth in Article 9, indemnify the Indemnifying Party from and against any Adverse Consequences the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim.  After notice by the Indemnifying Party to the Indemnified Party of its election to assume the defense of any Third Party Claim, the Indemnifying Party will not, as long as it diligently conducts such defense, be liable to the Indemnified Party for any fees of other counsel or any other expenses with respect to the defense of the Third Party Claim in each case subsequently incurred by the Indemnified Party in connection with the defense of such Third Party Claim.  The Indemnified Party shall make available to the Indemnifying Party, their attorneys and accountants, at all reasonable times, all books and records of the Indemnified Party or the Companies, as the case may be, relating to any Third Party Claim, and the Parties will render to each other such assistance as may reasonably be required in order to insure proper and adequate defense of any Third Party Claim.

(b)     So long as the Indemnifying Party is conducting the defense of the Third Party Claim, the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim.  The Indemnifying Party shall not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party unless (i) such judgment or settlement does not involve an injunction or other equitable relief, and (ii) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party.  The Indemnifying Party will have no liability or additional expense with respect to any compromise or settlement of any Third Party Claim effected without its prior written consent.

10.3    Calculation of Amounts; Other Limitations.

(a)    The amounts for which an indemnifying party shall be liable under Article 8 shall be net of any: (i) Tax Benefit realized by a party to be indemnified in respect of such party's Adverse Consequences; (ii) insurance proceeds received by a party to be indemnified in respect of such party's Adverse Consequences; and (iii) any amounts recovered or recoverable by the party to be indemnified pursuant to any indemnification by or indemnification agreement with any third party.   In no event shall Adverse Consequences under Article 8 include any incidental, consequential, lost profits or punitive damages. To the extent that indemnity payments under Article 8 would not give rise to a currently realized Tax Benefit but would reasonably be expected to give rise to a subsequently realized Tax Benefit to the party to receive such indemnity payment, then such indemnity payment shall be reduced by the present value of such to be realized Tax Benefit, using the Applicable Federal Rate to determine such present value. For purposes of this Agreement, a "Tax Benefit" means the reduction of Tax liabilities resulting from an increase in deductions, losses or tax credits or decrease in the income, gains or recapture of tax credits that the party to be indemnified would have reported or taken into account in the current taxable or a future taxable period subsequent to the Closing Date had the indemnity payment not been made.

(b)    Without prejudice to the rights of the Buyer to be indemnified, held harmless and reimbursed when and as required by Article 8, if any Adverse Consequences sustained by the Buyer are covered by an insurance policy or an indemnification obligation of another Person (other than an Affiliate of Buyer), the Buyer shall use commercially reasonable efforts to collect such insurance or indemnity payments. If the Buyer receives such insurance or indemnity payments prior to being indemnified, held harmless and reimbursed with respect to such Adverse Consequences, the payment with respect to such Adverse Consequences shall be reduced (but not below zero) by the amount of such insurance proceeds or indemnity payments to the extent related to such Adverse Consequences, net of attorneys' fees and other expenses incurred in connection with such recovery. If the Buyer receives such insurance proceeds or indemnity payments after being indemnified and held harmless with respect to such Adverse Consequences, the Buyer shall pay promptly to the Seller (up to a maximum of the total amount paid to the Buyer in respect of such Adverse Consequences) the amount of such insurance proceeds or indemnity payments to the extent related to such Adverse Consequences, net of attorneys' fees and other expenses incurred in connection with such recovery. For purposes of this Section 10.3, the Buyer shall not be deemed to have received an insurance payment if such payment is made under an insurance plan or program that is self-funded by Buyer or its Affiliates. If Buyer receives an indemnity payment on account of a claim for Adverse Consequences that Seller believes in good faith is covered by an insurance policy or an indemnification obligation of another Person (other than an Affiliate of Buyer), Buyer shall (i) on written request of Seller, assign, to the extent assignable, its rights under such insurance policy or indemnification obligation with respect to such claim for Adverse Consequences to Seller and (ii) be relieved of any further obligation to pursue collection of such insurance or indemnification (except that, if requested to do so by Seller, Buyer shall reasonably cooperate with Seller, at Seller's sole expense, to collect any such insurance or indemnification).

26

ARTICLE 11
DISPUTE RESOLUTION

11.1    Exclusive Procedure for Dispute Resolution.  Any dispute arising out of or relating to this Agreement or any of the agreements, documents and instruments executed and delivered in connection herewith and the transactions contemplated by any of the foregoing, including claims for indemnification pursuant to Article 8, shall be resolved in accordance with the procedures specified in this Article 11.

11.2    Negotiation Between Executives.

(a)    The Parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement or any of the agreements, documents and instruments executed and delivered in connection herewith and the transactions contemplated by any of the foregoing promptly by negotiation between the Seller and executives of Buyer who, if possible, shall be at a higher management level than the individuals with direct responsibility for administration of this Agreement (the "Negotiators").  Any Party may give the other Parties written notice of any dispute not resolved in the normal course of business.  Within 15 days after delivery of the notice, the receiving Party shall submit to the others a written response.  The notice and response shall include (i) a statement of each Party's position and a summary of arguments supporting that position, and (ii) the name and title of the Negotiators and of any other Person who will accompany them.  Within 30 days after delivery of the disputing Party's notice, the Negotiators shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute.  All reasonable requests for information made by one Party to the others will be honored.

(b)    If the matter has not been resolved by these Persons within 60 days of the disputing Party's notice, or if the Parties fail to meet within 30 days, any Party may initiate mediation as provided below.

(c)    All negotiations pursuant to this clause shall be confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and state rules of evidence.

11.3    Mediation.  If the dispute has not been resolved by negotiation as provided above, the Parties shall endeavor to settle the dispute by mediation under the then current Center for Public Resources ("CPR") Model Procedure for Mediation of Business Disputes.  The neutral third party will be selected from the CPR Panels of Neutrals, with the assistance of CPR, unless the Parties agree otherwise.

11.4    Litigation.  If the dispute has not been resolved by non-binding means as provided herein within 90 days of the initiation of such procedure contemplated by Section 11.3 hereof, any Party may initiate litigation (upon 30 days written notice to the other Party); provided, however, that if one Party has requested the others to participate in a non-binding procedure and the others have failed to participate, the requesting Party may initiate litigation before expiration of such period.

11.5    Provisional Remedies.  The procedures specified in this Article 11 shall be the sole and exclusive procedures for the resolution of disputes between the Parties arising out of or

27

relating to this Agreement; provided, however, that a Party, without prejudice to the above procedures, may file a complaint (for statute of limitations or venue reasons or to seek preliminary injunction or other provisional judicial relief), if in its reasonable judgment such action is necessary to avoid irreparable damage or to preserve the status quo.  Despite such action the Parties will continue to participate in good faith in following the dispute resolution procedures specified in this Article 11.

11.6   Tolling Statutes of Limitation.  All applicable statutes of limitation and defenses based upon the passage of time shall be tolled while the procedures specified in this Article 11 are pending. The Parties will take such action, if any, reasonably required to effectuate such tolling.

11.7   Performance to Continue.  Each Party shall continue to perform its obligations under this Agreement pending final resolution of any dispute arising out of or relating thereto.

ARTICLE 12
TERMINATION

12.1   Termination of Agreement.  The Parties may terminate this Agreement at any time prior to Closing as provided below:

(a)   Buyer and Seller may terminate this Agreement by mutual written consent;

(b)   Buyer may terminate this Agreement by giving written notice to the Seller in the event that (i) Seller has breached any representation, warranty or covenant contained in this Agreement in any material respect, Buyer has notified Seller of the breach, and the breach has continued without cure for a period of ten (10) business days after the notice of breach, (ii) Buyer reasonably determines that there has been a Material Adverse Effect with respect to the Seller and/or the Companies, Buyer gives written notice to Seller thereof within two (2) business days after its determination that a Material Adverse Effect has occurred, and the situation constituting the Material Adverse Effect has continued without cure for a period of ten (10) business days after the notice from Buyer; (iii) Buyer reasonably determines that new or changed information contained in any Disclosure Schedule Update reflects a Material Adverse Effect, Buyer gives written notice to Seller thereof within two (2) business days after receipt of the Disclosure Schedule Update, and such new or changed information contained therein is not removed from the Disclosure Schedule Update, as so amended or supplemented, within five (5) business days after Seller's receipt of such written notice from Buyer, or (iv) the Closing shall not have occurred on or before December 31, 2014 by reason of the failure of any condition precedent under Section 7.1 (unless the failure results primarily from Buyer's breach of any representation, warranty or covenant contained in this Agreement);

(c)   Seller may terminate this Agreement by giving written notice to Buyer in the event that (i) Buyer has breached any representation, warranty or covenant contained in this Agreement in any material respect, Seller has notified Buyer of the breach, and the breach has continued without cure for a period of 30 days after the notice of breach, or (ii) the Closing shall not have occurred on or before December 31, 2014 by reason of the failure of any condition precedent under Section 7.2 (unless the failure results primarily

28

from Seller's breach of any representation, warranty or covenant contained in this Agreement); and

      (d)    by Seller, if Buyer fails to file a "Form A" application with the TDI within fifteen (15) business days of the Effective Date.

12.2   <u>Effect of Termination</u>.  Except for Section 12.3, Section 14.11 and the provisions of the Non-Disclosure Agreement (which shall survive the termination of this Agreement), upon the termination of this Agreement no party hereto or any of its officers, directors, partners, employees, agents, consultants, stockholders, principals or any other Affiliate shall have any rights, liabilities or obligations hereunder or with respect hereto; provided, however, that nothing contained in Section 12.1 or this Section 12.2 shall relieve any party from liability for any willful breach of any representation or warranty or willful failure to comply with any covenant or agreement contained herein occurring prior to the termination of this Agreement.

12.3   <u>Break Up Fees.</u>

      (a)    Buyer shall deposit in a separate escrow account in the name of Mirage, the amount of $100,000 payable as a break-up fee to Seller in the event that Seller terminates this Agreement pursuant to Section 12.1(c) or Section 12.1(d); and

      (b)    Mirage shall deposit in a separate escrow account in the name of Buyer, the amount of $100,000 payable as a break-up fee to Buyer in the event that Buyer terminates this Agreement pursuant to Section 12.1(b)(i) or Section 12.1(b)(iv).

ARTICLE 13<br>DEFINITIONS

For purposes of this Agreement, the following terms have the meanings specified:

"<u>Adverse Consequences</u>" means all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, Liabilities, obligations, Taxes, losses, expenses and fees, including court costs and reasonable attorneys' fees and expenses.

"<u>Affiliate</u>" means any Person that directly or indirectly controls, is controlled by, or is in common control with, any other Person.  For purposes of the preceding sentence, "control" means possession, directly or indirectly, of the power to direct or cause direction of management and policies through ownership of voting securities, contract, voting trust or otherwise.

"<u>Broker</u>" has the meaning set forth in Section 2.3.

"<u>Buyer</u>" has the meaning set forth in the preface.

"<u>Closing</u>" has the meaning set forth in Section 1.3.

"<u>Closing Date</u>" has the meaning set forth in Section 1.3.

29

"Closing Net Asset Value" shall mean the net asset value of the Companies, taken as a whole (including the surplus as regards policyholders for RFIC) and determined in accordance with GAAP, as of the Closing Date.

"Code" means the Internal Revenue Code of 1986, as amended.

"Companies" has the meaning set forth in the preface.

"CPR" has the meaning set forth in Section 11.3.

"Disclosure Schedule" has the meaning set forth in Section 1.2(d).

"Disclosure Schedule Update" has the meaning set forth in Section 5.7(a).

"Disputed Items" has the meaning set forth in Section 1.3(c).

"Environmental, Health, and Safety Laws" means any federal, state, or local statute, law, ordinance, code, order, injunction, decree, ruling; any regulations promulgated thereunder, or any nuisance, trespass, strict liability or negligence theory of liability which regulates or controls pollution or protection of the environment, public health and safety, or employee health and safety, including laws relating to emissions, discharges, releases, or threatened release of pollutants, contaminants, or chemical, industrial, toxic or Hazardous Substances or waste into ambient air, surface water, ground water or lands or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, or chemical, industrial, toxic or Hazardous Substances or waste.  The term specifically includes, without limitation: CERCLA; RCRA; the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.*, as amended; the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*, as amended; the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, as amended; the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, as amended; the Safe Water Drinking Act, 42 U.S.C. § 300f *et seq.*, as amended; the Emergency Planning and Community Right to Know Act, 42 U.S.C. § 1101 *et seq.*, as amended; the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et seq.*, as amended; the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.*, as amended; the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, as amended; any similar state or local statutes or ordinances and the regulations promulgated thereunder.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Fixed Assets" has the meaning set forth in Section 3.12.

"GAAP" has the meaning set forth in Section 3.7(a).

"GAAP Statements" has the meaning set forth in Section 3.7(a).

"Governing Documents" means, as to any Person, the articles of incorporation, certificate of formation or certificate of incorporation and code of regulations and/or bylaws (if such Person is a corporation); or the articles of organization, certificate of formation and company agreement (if such Person is a limited liability company); and other documents relating to and establishing or governing the existence and legal operation of such Person, of any type or nature, each as amended to date.

"Hazardous Substances" means any toxic substance, hazardous substance, hazardous waste, hazardous material, solid waste, residual waste, infectious waste, contaminant, pollutant, or constituent thereof, whether solid, semi-solid, liquid or gaseous, which are regulated, listed or controlled by Environmental, Health and Safety Laws.

"Indemnified Party" has the meaning set forth in Section 10.1.

"Indemnifying Party" has the meaning set forth in Section 10.1.

"Knowledge of Seller" or "Knowledge of Mirage" and all similar phrases relating to facts designated herein as known to Seller or Mirage means the actual knowledge of Seller without any obligation to make inquiry or investigation.

"Lease" has the meaning set forth in Section 5.10.

"Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"Material Adverse Effect" means, with respect to any Person, any change or effect that is materially adverse to the business or financial condition of such Person and its Subsidiaries as a whole.  With respect to the Seller, any change or effect that results in (i) the reduction of the aggregate net asset value of the Companies taken as a whole (including the surplus as regards policyholders of RFIC) in an amount exceeding five hundred thousand dollars ($500,000); or (ii) the surplus as regards policyholders of RFIC falls below the minimum amount required by law, shall be deemed to be a Material Adverse Effect.

"Most Recent Financial Statements" has the meaning set forth in Section 3.7(a).

"Most Recent Fiscal Period End" has the meaning set forth in Section 3.7(a).

"Negotiators" has the meaning set forth in Section 11.2(a).

"Net Loss Development" shall mean (w) loss and expense reserves, including reserves for losses incurred but not reported, for losses with a loss date prior to the Closing Date outstanding as of December 31, 2015, *plus* (x) losses and expenses paid during the period from the Closing Date to December 31, 2015 for losses with a loss date prior to the Closing Date, *minus* (y) loss and expense reserves, including reserves for losses incurred but not reported, outstanding at the Closing Date, *minus* (z) a $75,000 allowance.

"Non-Disclosure Agreement" means that certain Non-Disclosure Agreement dated June 25, 2014 by and between Buyer and Seller.

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice.

"Parties" and "Party" have the meaning set forth in the preface.

"Person" means a natural person, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated

31

organization or a governmental entity (or any department, agency or political subdivision thereof).

"Purchase Price" has the meaning set forth in Section 1.2.

"Reasonable Best Efforts" or phrases similar thereto means the reasonable commercial efforts that a prudent Person desirous of achieving a result would use in similar circumstances in an effort to ensure that such result is achieved as expeditiously as possible.  As used herein, the term "Reasonable Best Efforts" shall not include any obligation on the part of Seller or any of the Companies to agree to any material adverse modification of the terms of any document or contractual arrangement or to repay or incur additional material obligations to any Person that would be effective prior to the Closing or to pay any monetary amount or other expenses exceeding, in the aggregate, $2,500 in furtherance of such efforts.

"RFIC" has the meaning set forth in the preface.

"Securities Act" means the Securities Act of 1933, as amended.

"Security Interest" means any mortgage, pledge, lien, encumbrance, charge or other security interest, other than (a) mechanic's and similar liens, (b) liens for Taxes not yet due and payable or for Taxes that the taxpayer is contesting in good faith through appropriate proceedings, (c) purchase money liens and liens securing rental payments under capital lease arrangements, and (d) other liens arising in the Ordinary Course of Business and not incurred in connection with the borrowing of money.

"Seller" has the meaning set forth in the preface.

"Shares" has the meaning set forth in the Recitals.

"Spindletop" has the meaning set forth in the preface.

"SSUGA" has the meaning set forth in the preface.

"Starting Net Asset Value" shall mean the aggregate net asset value of the Companies, taken as a whole (including the surplus as regards policyholders for RFIC) and determined in accordance with GAAP, as of June 30, 2014.

"Subsidiary" means, when used with reference to an entity, any other entity of which the first entity owns directly or indirectly more than 50% of the outstanding securities entitled generally to vote for the election of directors or other persons performing similar functions.

"Tax" means any federal, state, local or foreign income, gross receipts, gross income, capital gains, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum or other tax of any kind whatsoever, including any interest, penalty or addition thereto.

"Tax Benefit" has the meaning set forth in Section 10.3(a).

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"TDI" means the Texas Department of Insurance.

"Third Party Claim" has the meaning set forth in Section 10.1.

## ARTICLE 14
## MISCELLANEOUS

14.1    Press Releases and Public Announcements.  Neither Buyer nor Seller shall issue any press release or make any public announcement relating to the subject matter of this Agreement prior to the Closing without the prior written approval of Buyer and the Seller.

14.2    No Third-Party Beneficiaries.  This Agreement and the other agreements, certificates and instruments contemplated hereby shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

14.3    Entire Agreement.  This Agreement, including the documents referred to herein, constitutes the entire agreement among the Parties and supersedes all prior understandings, agreements and representations by or among the Parties, written or oral, to the extent relating in any way to the subject matter hereof; provided, however, that the Non-Disclosure Agreement shall survive execution of this Agreement and be deemed incorporated herein by this reference to the extent it does not conflict with the terms of this Agreement.

14.4    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any rights, interests or obligations hereunder without the prior written approval of the other Parties.

14.5    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

14.6    Headings.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

14.7    Notices.  All notices, requests, demands, claims, and other communications hereunder shall be in writing.  Any notice, request, demand, claim or other communication hereunder shall be deemed duly given if (and then five business days after) it is sent by registered or certified mail, return receipt requested, postage prepaid, and addressed to the intended recipient as set forth below:

> If to Seller:        c/o  Ted Moor Jr.
>                      Mirage Interests, Inc.
>                      505 Orleans, Suite 502
>                      Beaumont, Texas  77701
>                      Telephone: (409) 832-4565

33

Fax: (409) 832-4574

Copy to:       Winstead PC
401 Congress Avenue, Suite 2100
Austin, Texas 78701
Telephone: (512) 370-2800
Fax: (512) 370-2850
Attention: Keith Hopkinson, Esq.

If to Buyer:     c/o Mitch Sattler
Anchor Insurance Holdings, Inc.
14018 18th Place East
Bradenton, FL 34212
msattler@anchorpcins.com

Copy to:       Sandy P. Fay, Esq.
Colodny, Fass, Talenfeld, Karlinsky, Abate & Webb, P.A.
One Financial Plaza, 23rd Floor
100 Southeast Third Avenue
Ft. Lauderdale, Florida 33394

Any Party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the address set forth above using any other means (including personal delivery, expedited or air courier, messenger service, telecopy, telex, ordinary mail, or electronic mail), but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient. Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

14.8    <u>Governing Law, Consent to Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Texas without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State Texas. SUBJECT IN ALL RESPECTS TO ARTICLE 11, THE PARTIES HEREBY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF TEXAS LOCATED IN TRAVIS COUNTY, AND THE UNITED STATES DISTRICT COURT WESTERN DISTRICT LOCATED IN AUSTIN, TEXAS SOLELY WITH RESPECT TO ACTIONS RELATED TO THIS AGREEMENT. EACH PARTY HEREBY WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS, AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER, AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT.

14.9    <u>Amendments and Waivers</u>. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by all Parties hereto. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default,

34

misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

14.10   Severability.   Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

14.11   Expenses.  Buyer shall bear its own costs, fees and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.   Mirage shall bear its own costs, fees and expenses (including all legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

14.12   Incorporation of Exhibits and Schedules.   The Exhibits and Schedules identified in this Agreement (including the Disclosure Schedules) are incorporated herein by reference and made a part hereof.  Any disclosure by Seller in any Disclosure Schedule attached hereto shall constitute a disclosure under each other Disclosure Schedule referred to therein, whether or not such disclosure is specifically referenced within such other Disclosure Schedule.

14.13   Interpretation.   As used in this Agreement, (a) "including" means "including, without limitation"; and (b) all dollar amounts are expressed in United States funds.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by all parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

14.14   **WAIVER OF JURY TRIAL.  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BUYER AND SELLER HEREBY IRREVOCABLY AND EXPRESSLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER DOCUMENTS AND AGREEMENTS DELIVERED IN CONNECTION HEREWITH, THE TRANSACTION OR THE ACTIONS OF BUYER OR SELLER IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT HEREOF OR THEREOF.**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**BUYER:**

ANCHOR INSURANCE HOLDINGS, INC.,

By:

Name: Mitch Sattler

Title:  President and CEO

**SELLER:**

MIRAGE INTERESTS, INC.

By:

Name:   Wesley W. Shipley

Title:    Vice President

Exhibit 2 – Declaration of W. Shipley

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **MIRAGE INTERESTS, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CASE NO. 1:16-cv-00594-LY** |
| | § | |
| **ANCHOR INSURANCE HOLDINGS,** | § | |
| **INC.,** | § | |
| | § | |
| **Defendant.** | § | |

<u>**DECLARATION OF WESLEY SHIPLEY**</u>

"Pursuant to 28 U.S.C. § 1746, I, Wesley Shipley, declare under penalty of perjury that the following is true and correct.

1.      My name is Wesley Shipley.  I am President of Mirage Interests, Inc. ("Mirage"). Mirage has sued Anchor Insurance Holdings, Inc.  ("Anchor") in the above-referenced matter. I have been requested to provide this statement setting out my knowledge relating to the allegations currently being made by Mirage against Anchor.

2.      Mirage and Anchor are parties to a Stock Purchase Agreement (the "Agreement") calling for the sale of certain interests in insuring entities. Under the Agreement, Mirage was seller and Anchor was buyer of interests in the following entities: (1) Ranchers and Farmers Insurance Company, a Texas insurance corporation; (2) Spindletop Premium Finance, Inc., a Texas corporation; and (3) Southeast Surplus

Underwriters General Agency, Inc., a Texas corporation (the "Acquired Companies"). A true and correct copy of the Agreement is attached hereto as **Exhibit 1**.

3.    Under their Agreement, the parties agreed to set aside a portion of the purchase price payment as a mechanism to adjust the purchase price based on claims experience for 2015. The amount of the purchase price that was set aside was $500,000.

4.    The Agreement contained a clause outlining a process by which the purchase price paid by Anchor to Mirage for the Acquired Companies could be adjusted downward upon the occurrence of a number of events, including a requirement pertaining to delivery of notice to Mirage by Anchor on or before a specified deadline. *See* **Exhibit 1**, ¶¶ 1.1-3.

5.    The adjustment, in an amount not to exceed $500,000, could be made if a certain net asset value adjustment threshold was met, or if a net loss development calculation confirmed certain losses and expenses exceeded a $75,000 allowance. *See* **Exhibit 1**, ¶ 1.3.

6.    The parties discussed setting aside $500,000 of the purchase payment in a trust escrow to be held until Anchor gave notice of a claim for price adjustment or the time for notice of a claim for adjustment had expired. I have reviewed Mirage's records and I have not located any escrow agreement signed by either Mirage or Anchor. Mirage requested a copy of the escrow agreement and, in response, Anchor's counsel provided the Escrow Agreement attached as **Exhibit 3**. **Exhibit 3** is a form of escrow

**DECLARATION OF WESLEY SHIPLEY - Page 2**

agreement that Mirage did not execute. Moreover, **Exhibit 3** only bears the escrow agent's signature.

7.      With regard to the timeliness of any notice seeking to invoke the process by which Anchor could request a Net Loss Development adjustment, the Agreement provides a specific deadline of January 31, 2016.

8.      No such notice was sent by Anchor or received by Mirage on or before January 31, 2016.

9.      Accordingly, under the Agreement, Anchor did not request any adjustment under the Agreement, and certain sums categorized as proceeds otherwise payable to Mirage as part of the purchase price should have been released to Mirage.

10.     Mirage has requested that Anchor honor the terms of the Agreement and allow for the release of all sums lawfully due to be paid to Mirage. Despite such demand, Anchor has failed and refused to take any steps to authorize release of the $500,000 that is being held.

I, Wesley Shipley, declare under penalty of perjury that the foregoing is true and correct."

EXECUTED on October 14, 2016, in Jefferson County, State of Texas.


_____
WESLEY SHIPLEY

**DECLARATION OF WESLEY SHIPLEY - Page 3**

Exhibit 1 to Exhibit 2

STOCK PURCHASE AGREEMENT

BY AND BETWEEN

ANCHOR INSURANCE HOLDINGS, INC.

AND

MIRAGE INTERESTS, INC.

Dated:   As of August 15 2014

## TABLE OF CONTENTS

Page

ARTICLE 1 TRANSACTION; PURCHASE PRICE; CLOSING ................................... 1
    1.1    Basic Transaction ........................................................................................... 1
    1.2    Purchase Price ................................................................................................ 1
    1.3    Purchase Price Adjustments ........................................................................... 2
    1.4    The Closing .................................................................................................... 3
    1.5    Deliveries at the Closing ................................................................................ 3

ARTICLE 2 REPRESENTATIONS AND WARRANTIES OF MIRAGE ..................... 3
    2.1    Capacity and Authorization of Mirage .......................................................... 4
    2.2    Noncontravention ........................................................................................... 4
    2.3    Brokers' Fees ................................................................................................. 4

ARTICLE 3 REPRESENTATIONS AND WARRANTIES CONCERNING THE
SHARES ...................................................................................................................... 4
    3.1    Organization, Qualification, and Corporate Power ....................................... 4
    3.2    Capitalization ................................................................................................. 5
    3.3    Noncontravention ........................................................................................... 5
    3.4    Insurance Legal Compliance .......................................................................... 6
    3.5    Insurance Issued by RFIC and SSUGA .......................................................... 6
    3.6    Brokers' Fees ................................................................................................. 7
    3.7    Financial Statements; Liabilities .................................................................... 7
    3.8    Events Subsequent to Most Recent Fiscal Period End ................................... 8
    3.9    Regulatory Filings .......................................................................................... 9
    3.10   Tax Matters .................................................................................................... 9
    3.11   Real Property ................................................................................................. 9
    3.12   Title to Assets ................................................................................................ 10
    3.13   Intellectual Property ....................................................................................... 10
    3.14   Contracts ........................................................................................................ 10
    3.15   Insurance ........................................................................................................ 11
    3.16   Material Litigation ......................................................................................... 11
    3.17   Labor and Employment Matters .................................................................... 12
    3.18   Employee Benefits ......................................................................................... 12
    3.19   Guaranties ...................................................................................................... 12
    3.20   Environment, Health and Safety .................................................................... 12
    3.21   Certain Business Relationships with the Companies ...................................... 13
    3.22   Stock Records ................................................................................................. 13
    3.23   Labor Relations .............................................................................................. 13
    3.24   Customers ....................................................................................................... 13
    3.25   Licenses and Permits ...................................................................................... 13

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER ...................... 13
    4.1    Organization of Buyer .................................................................................... 13
    4.2    Authorization of Buyer .................................................................................. 13

4.3    Noncontravention................................................................................. 14
4.4    Brokers' Fees...................................................................................... 14
4.5    Investment Representations................................................................. 14
4.6    Financing............................................................................................ 15
4.7    Absence of Litigation......................................................................... 15
4.8    No Knowledge of Misrepresentations or Omissions .......................... 15
4.9    No Other Representations ................................................................... 15

ARTICLE 5 PRE-CLOSING COVENANTS ............................................................... 15
5.1    General; Timing of Closing ................................................................ 15
5.2    Notices and Consents......................................................................... 16
5.3    Operation of Business ........................................................................ 16
5.4    Preservation of Business .................................................................... 16
5.5    Full Access......................................................................................... 16
5.6    Notice of Developments ..................................................................... 17
5.7    Disclosure Schedule Update .............................................................. 17
5.8    Compensation Arrangements.............................................................. 17
5.9    Employees; Consultants..................................................................... 18
5.10  Office Lease....................................................................................... 18

ARTICLE 6 POST-CLOSING COVENANTS .............................................................. 18
6.1    General............................................................................................... 18
6.2    Indemnification................................................................................... 18
6.3    Mutual Cooperation ........................................................................... 19

ARTICLE 7 CONDITIONS TO OBLIGATION TO CLOSE ........................................ 21
7.1    Conditions to Obligation of Buyer...................................................... 21
7.2    Conditions to Obligation of Seller ...................................................... 22

ARTICLE 8 INDEMNIFICATION................................................................................ 23
8.1    Survival of Representations and Warranties........................................ 23
8.2    Indemnification Provisions for Benefit of Buyer................................. 23
8.3    Indemnification Provisions for Benefit of Seller ................................ 23
8.4    Exclusive Remedy ............................................................................. 23

ARTICLE 9 LIMITATIONS ON INDEMNIFICATION .............................................. 24
9.1    Term................................................................................................... 24
9.2    Indemnification Basket....................................................................... 24
9.3    Limited Recourse ............................................................................... 24

ARTICLE 10 COOPERATION ..................................................................................... 25
10.1  Notice of Claims ................................................................................ 25
10.2  Right to Defense ................................................................................ 25
10.3  Calculation of Amounts; Other Limitations ....................................... 26

ARTICLE 11 DISPUTE RESOLUTION ....................................................................... 27
11.1  Exclusive Procedure for Dispute Resolution ...................................... 27

| | | |
|---|---|---|
| 11.2 | Negotiation Between Executives | 27 |
| 11.3 | Mediation | 27 |
| 11.4 | Litigation | 27 |
| 11.5 | Provisional Remedies | 27 |
| 11.6 | Tolling Statutes of Limitation | 28 |
| 11.7 | Performance to Continue | 28 |
| **ARTICLE 12 TERMINATION** | | 28 |
| 12.1 | Termination of Agreement | 28 |
| 12.2 | Effect of Termination | 29 |
| 12.3 | Break Up Fees | 29 |
| **ARTICLE 13 DEFINITIONS** | | 29 |
| **ARTICLE 14 MISCELLANEOUS** | | 33 |
| 14.1 | Press Releases and Public Announcements | 33 |
| 14.2 | No Third-Party Beneficiaries | 33 |
| 14.3 | Entire Agreement | 33 |
| 14.4 | Succession and Assignment | 33 |
| 14.5 | Counterparts | 33 |
| 14.6 | Headings | 33 |
| 14.7 | Notices | 33 |
| 14.8 | Governing Law, Consent to Jurisdiction | 34 |
| 14.9 | Amendments and Waivers | 34 |
| 14.10 | Severability | 35 |
| 14.11 | Expenses | 35 |
| 14.12 | Incorporation of Exhibits and Schedules | 35 |
| 14.13 | Interpretation | 35 |
| 14.14 | WAIVER OF JURY TRIAL | 35 |

**EXHIBITS:**

"A"    -    Form of Employment Agreement

AUSTIN_1/749085v.9 51560-1

STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this "Agreement") is entered into as of August 15, 2014 (the "Effective Date"), by and between Anchor Insurance Holdings, Inc., a Florida corporation ("Buyer"), and Mirage Interests, Inc., a Texas corporation ("Mirage" or "Seller") and the sole owner of Ranchers and Farmers Insurance Company, a Texas insurance corporation ("RFIC"), Spindletop Premium Finance, Inc., a Texas corporation ("Spindletop"), and Southeast Surplus Underwriters General Agency, Inc., a Texas corporation ("SSUGA"and together with RFIC and Spindletop, the "Companies" and individually, a "Company").  Buyer and Seller are sometimes referred to collectively herein as the "Parties." Capitalized terms used in this Agreement but not defined in the body of this Agreement have the meanings ascribed to them in Article 13. Capitalized terms defined in the body of this Agreement are listed in Article 13 by location of the definition of such terms in the body of this Agreement.

RECITALS

This Agreement contemplates a transaction in which Buyer will purchase from Mirage, and Mirage will sell to Buyer, all of the issued and outstanding capital stock of each of the Companies (collectively, the "Shares") in return for the cash consideration and other obligations set forth below.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows.

ARTICLE 1
TRANSACTION; PURCHASE PRICE; CLOSING

1.1    Basic Transaction.  On and subject to the terms and conditions of this Agreement, at the Closing, Buyer agrees to purchase from Mirage, and Mirage agrees to sell, assign, transfer and deliver to Buyer, all of the outstanding capital stock of the Companies, for the Purchase Price, free and clear of any and all Security Interests.  The Shares of the Companies to be sold, assigned and transferred pursuant to this Article 1 represent in the aggregate all of the issued and outstanding shares of the capital stock of the Companies.

1.2    Purchase Price.  In consideration of the sale of the Shares, Buyer shall deliver to Seller, subject to the adjustments described herein, Four Million Five Hundred Thousand Dollars ($4,500,000.00) (the "Purchase Price"), payable in accordance with the following:

(a)    Four Million Dollars ($4,000,000.00) of the Purchase Price shall be payable in cash at the Closing;

(b)    The remainder of the Purchase Price shall be payable in cash on or before March 1, 2016, which such payment shall be secured by a trust account or letter of credit, and may be subject to adjustments as set forth in Section 1.3, and indemnification claims made in accordance with Section 8.2;

(c)    All payments shall be by wire transfer, to be deposited in such bank accounts as Seller shall designate in writing to Buyer prior to the Closing; and

(d)     The Purchase Price is to be allocated among the Companies as set forth in Section 1.2(d) of the disclosure schedule delivered by Seller to Buyer on the Effective Date, a copy of which is attached hereto and acknowledged by the Parties (the "Disclosure Schedule")

1.3     Purchase Price Adjustments.   Following the Closing, the Purchase Price shall be adjusted (x) if the Closing Net Asset Value is more than five percent (5.0%) different from the Starting Net Asset Value; and (y) to reflect the difference between the Companies' Net Loss Development between the Closing Date and December 31, 2015.  All Purchase Price adjustments pursuant to this Section 1.3 shall be net of any: (i) Federal income tax realized in respect of such adjustments; and (ii) reinsurance loss recoveries with respect to losses with loss dates prior to the Closing Date. The aggregate of all Purchase Price adjustments, whether positive or negative, will be capped at $500,000.00.

(a)     Closing Net Asset Value Adjustments.

(i)     Within 30 days after the Closing Date, Buyer shall prepare and deliver to Seller a statement setting forth the Closing Net Asset Value, which shall be accompanied by reasonable detail and related backup information.

(ii)     At such time as the Closing Net Asset Value shall become final in accordance with Section 1.3(c), it shall be compared to the Starting Net Asset Value. If the Closing Net Asset Value exceeds the Starting Net Asset Value by more than five percent (5.0%), Buyer shall be obligated to pay to Seller the entire amount of such excess, in cash in immediately available funds, on the date set forth in Section 1.2(b). If the Starting Net Asset Value exceeds the Closing Net Asset Value by more than five percent (5.0%), the Purchase Price payment to be made pursuant to Section 1.2(b) shall be reduced by the difference.

(b)     Adjustments for Net Loss Development.

(i)     By no later than January 31, 2016, Buyer shall prepare and deliver to Seller a statement setting forth the amount of the Net Loss Development, which shall be accompanied by reasonable detail and related backup information.

(ii)     The adjustment for the Net Loss Development shall be made at such time as the Net Loss Development shall become final in accordance with Section 1.3(c). If the Net Loss Development is a positive amount, the Purchase Price payment to be made pursuant to Section 1.2(b) shall be reduced by the amount of the Net Loss Development. If the Net Loss Development is a negative amount, Buyer shall be obligated to pay to Seller the amount of the Net Loss Development, in cash in immediately available funds, on the date set forth in Section 1.2(b).

(c)     Dispute Resolution Procedure.

(i)     Seller shall have 30 days from receipt of Buyer's calculations of the Closing Net Asset Value and the Net Loss Development to raise any objection(s) to Buyer's calculations by delivery of written notice to Buyer setting forth such objection(s) in reasonable detail (the "Disputed Items").  If Seller does

2

not deliver any such objection(s) within such 30-day period, then the resulting adjusted Purchase Price shall be deemed final for purposes of this 1.3. If any such objection(s) are so delivered, the resulting adjusted Purchase Price shall be deemed not final and Buyer and Seller shall attempt to resolve the Disputed Items in accordance with the procedures set forth in Article 11. In connection with the foregoing, the finder of fact shall be instructed to and must (i) limit its determination(s) only to the Disputed Items, and (ii) not assign a value to any Disputed Item greater than the highest value for such Disputed Item claimed by either Buyer or Seller or less than the lowest value for such Disputed Item claimed by either Buyer or Seller. All determinations by the fact finder shall be final and binding upon the parties for purposes of this 1.3, absent fraud or manifest error. The fees and expenses of the fact finder, if any, shall be borne by the party(ies) against whom the fact finder shall have substantially ruled.

(ii) During the period that Seller and its advisors and representatives are conducting their review of Buyer's calculations of the Closing Net Asset Value and the Net Loss Development, the Seller and its advisors and representatives will have reasonable access during normal business hours to the records of the Companies and the calculations prepared by or on behalf of Buyer and its representatives in connection with Buyer's calculation of the Closing Net Asset Value and the Net Loss Development.

(iii) Seller and Buyer acknowledge and agree that any payment or adjustment made pursuant to this 1.3 will be treated as an adjustment to the Purchase Price for income tax purposes.

1.4    The Closing. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Winstead PC, 401 Congress Avenue, Suite 2100, Austin, Texas 78701, commencing at 10:00 a.m. local time on the second business day following the satisfaction or waiver of all conditions to the obligations of the Parties to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective Parties will take at the Closing itself) or such other date and time as Buyer and the Seller may mutually determine (the "Closing Date").

1.5    Deliveries at the Closing. At the Closing, (a) Mirage will deliver to Buyer the various certificates, instruments, and documents referred to in Section 7.1, (b) Buyer will deliver to Seller the various certificates, instruments, and documents referred to in Section 7.2, (c) Mirage will deliver to Buyer stock certificates representing the Shares, duly endorsed to Buyer or accompanied by duly executed stock powers duly endorsed in blank, (d) any surplus note of RFIC may, at the discretion and direction of Buyer, be terminated or remain in place and (e) Buyer will deliver to Seller the Purchase Price in accordance with Section 1.2.

ARTICLE 2
REPRESENTATIONS AND WARRANTIES
OF MIRAGE

Mirage represents and warrants to Buyer, as of the Effective Date and as of the Closing (unless such representation or warranty is as of a specified date and then solely as of such date), as follows:

3

2.1     Capacity and Authorization of Mirage.  Mirage is an existing corporation with the requisite power and authority to execute and deliver this Agreement, and the other agreements contemplated herein, and to perform its obligations hereunder and thereunder.  This Agreement constitutes, and upon execution by the other Parties hereto will constitute, the valid and legally binding obligations of Mirage, enforceable in accordance with its terms and conditions, except as enforcement may be limited by general principles of equity, whether applied in a court of law or a court of equity, and by bankruptcy, insolvency, moratorium or other similar laws affecting creditors' rights and remedies generally.

2.2     Noncontravention.  Except as set forth in Section 2.2 of the Disclosure Schedule, to the Knowledge of Mirage, neither the execution and delivery of this Agreement, and the other agreements contemplated hereby, nor the consummation of the transactions contemplated hereby and thereby, will (i) violate any statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency or court to which Mirage is subject or its Governing Documents, or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any material agreement, contract, lease, license or instrument to which Mirage is a party or by which Mirage is bound or to which any of Mirage's assets is subject.  Except for the filings required by the Texas Department of Insurance ("TDI"), Mirage is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any government or governmental agency for the Parties to consummate the transactions contemplated by this Agreement.

2.3     Brokers' Fees.  Except for the fees payable to Merger & Acquisition Services, Inc. (the "Broker") listed in Section 2.3 of the Disclosure Schedule, which shall be paid on or before the Closing Date, neither Mirage nor the Companies has any Liability or obligation to pay any finder's fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Buyer or the Companies are or could become liable or obligated.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES
CONCERNING THE SHARES

Mirage represents and warrants to Buyer, as of the Effective Date and as of the Closing (unless such representation or warranty is as of a specified date and then solely as of such date), as follows:

3.1     Organization, Qualification, and Corporate Power.  RFIC, Spindletop and SSUGA are corporations duly incorporated, validly existing and in good standing under the laws of the State of Texas.  Each of the Companies is duly authorized to conduct business and is in good standing under the laws of each jurisdiction in which the Companies lease real property, maintain an office or have employees residing, except when the failure to be so qualified would not have a Material Adverse Effect.  Each of the Companies has the requisite corporate power and authority to carry on the businesses in which it is engaged and to own and use its properties as they are now owned and used.  Section 3.1 of the Disclosure Schedule lists the directors and officers of the Companies.

4

3.2     Capitalization.

(a)     The authorized capital stock of RFIC consists of 3,500,000 shares, par value $1.00 per share, consisting of 3,500,000 shares of Common Stock, of which 1,900,000 shares of Common Stock are issued and outstanding. All Shares are duly authorized, validly issued, fully paid and non-assessable, and are held of record and owned beneficially by Mirage.  Except as set forth in Section 3.2(a) of the Disclosure Schedule, there are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other contracts or commitments that require RFIC to issue, sell or otherwise cause to become outstanding any of its capital stock.   There are no outstanding stock appreciation rights, phantom stock or similar rights with respect to RFIC.   Except as set forth in Section 3.2(a) of the Disclosure Schedule, RFIC has no obligation of any kind to issue any additional Shares to any Person.  RFIC does not have any Subsidiary, and does not hold any material direct or indirect beneficial interest in any other corporation, partnership, joint venture or other entity or enterprise.

(b)     The authorized capital stock of Spindletop consists of 500,000 shares, par value $1.00 per share, consisting of 500,000 shares of Common Stock, of which 30,000 shares of Common Stock are issued and outstanding. All Shares are duly authorized, validly issued, fully paid and non-assessable, and are held of record and owned beneficially by Mirage.  Except as set forth in Section 3.2(b) of the Disclosure Schedule, there are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other contracts or commitments that require Spindletop to issue, sell or otherwise cause to become outstanding any of its capital stock. There are no outstanding stock appreciation rights, phantom stock or similar rights with respect to Spindletop.  Except as set forth in Section 3.2(b) of the Disclosure Schedule, Spindletop has no obligation of any kind to issue any additional Shares to any Person. Spindletop does not have any Subsidiary and does not hold any material direct or indirect beneficial interest in any other corporation, partnership, joint venture or other entity or enterprise.

(c)     The authorized capital stock of SSUGA consists of 1,000,000 shares, par value $1.00 per share, consisting of 1,000,000 shares of Common Stock, of which 1,273 shares of Common Stock are issued and outstanding.   All Shares are duly authorized, validly issued, fully paid and non-assessable, and are held of record and owned beneficially by Mirage.  Except as set forth in Section 3.2(c) of the Disclosure Schedule, there are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other contracts or commitments that require SSUGA to issue, sell or otherwise cause to become outstanding any of its capital stock. There are no outstanding stock appreciation rights, phantom stock or similar rights with respect to SSUGA.  Except as set forth in Section 3.2(c) of the Disclosure Schedule, SSUGA has no obligation of any kind to issue any additional Shares to any Person. SSUGA does not have any Subsidiary and does not hold any material direct or indirect beneficial interest in any other corporation, partnership, joint venture or other entity or enterprise.

3.3     Noncontravention.  Except as set forth in Section 3.3 of the Disclosure Schedule, to the Knowledge of Mirage, neither the execution and delivery of this Agreement, nor the

consummation of the transactions contemplated hereby, will (a) violate any statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency or court to which any of the Companies are subject or any provision of the Governing Documents of the Companies, or (b) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any material agreement, contract, lease, license or instrument to which any of the Companies is a party or by which any of the Companies are bound or to which any of the Companies' assets are subject (or result in the imposition of any Security Interest upon any of the Companies' assets). Except as specifically provided otherwise in this Agreement, an agreement, contract, lease, license or instrument shall be considered material for purposes of this Agreement only if it involves (i) executory performance of services or delivery of goods or materials to or by the Companies of an amount in excess of $250,000 and is not terminable by the Companies, or any other Person on 90 days' or less prior notice without liability, (ii) the future expenditure or receipt by the Companies in excess of $250,000, (iii) the lease, rental or occupancy of real or personal property involving the future expenditure by the Companies in excess of $250,000 in the current or any ensuing fiscal year, or (iv) any agreement pursuant to which the Companies licenses software or other intellectual property, other than commercially available software programs generally available to the public which have been licensed to the Companies pursuant to standard end-user licenses. Except for filings required by TDI or except as set forth in Section 3.3 of the Disclosure Schedule, none of the Companies are required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any government or governmental agency in order for the Parties to consummate the transactions contemplated by this Agreement, other than for such notices, filings, authorizations, consents or approvals, the failure of which to give or obtain would not result in a Material Adverse Effect.

3.4    _Insurance Legal Compliance_.   To the Knowledge of Mirage, all outstanding insurance Contracts issued, reinsured, or underwritten by RFIC or SSUGA are, to the extent required under Applicable Laws, on forms which were submitted to and approved by the insurance regulatory authority of the jurisdiction where such insurance Contracts were issued or delivered, or have been filed with and not objected to by such authority within the period provided for objection. The rates charged for insurance under the insurance Contracts issued by RFIC, or through SSUGA, as applicable, have been determined in accordance with usual and customary actuarial principles and practices.

3.5    _Insurance Issued by RFIC and SSUGA_.  Except as required by law or except as disclosed in Section 3.5 of the Disclosure Schedule, to the Knowledge of Mirage:

(a)    All insurance Contract benefits payable by RFIC to any other Person that is a party to or bound by any insurance, reinsurance, coinsurance, or other similar Contract with RFIC have in all material respects been paid in accordance with the terms of the insurance, reinsurance, coinsurance and other Contracts under which they arose, except for such benefits for which RFIC reasonably believes there is a reasonable basis to contest payment.

(b)    No outstanding insurance Contract issued, reinsured, or underwritten by RFIC entitles the holder thereof or any other Person to receive dividends, distributions, or to share in the income of RFIC or to receive any other benefits based on the revenues or earnings of RFIC or any other Person.

6

(c)     Each insurance agent, at the time such agent wrote, sold, or produced business for RFIC or SSUGA, was duly licensed as an insurance agent (for the type of business written, sold, or produced by such insurance agent) in the particular jurisdiction in which such agent wrote, sold, or produced such business for RFIC or SSUGA, as applicable.

(d)     No such insurance agent violated (or with or without notice or lapse of time or both, would have violated) any term or provision of any law or any writ, judgment, decree, injunction, or similar order applicable to the writing, sale, or production of business for RFIC or SSUGA, other than such violations as would not have a Material Adverse Effect.

3.6     <u>Brokers' Fees</u>.  Except for the fees payable to Broker, which shall be paid on or before the Closing Date, none of the Companies has any Liability or obligation to pay any finder's fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

3.7     <u>Financial Statements; Liabilities</u>.

(a)     Seller has made available to Buyer true and complete financial statements and all amendments thereto of Mirage and Affiliates, including the Companies, as audited by Plante & Moran, PLLC for the years ended December 31, 2012, 2011 and 2010, and the unaudited financial statements (the "<u>Most Recent Financial Statements</u>") as of and for the year ended December 31, 2013 and quarterly period ended June 30, 2014 (the "<u>Most Recent Fiscal Period End</u>"), together with all exhibits and schedules thereto (collectively, the "<u>GAAP Statements</u>").  Each of the GAAP Statements presents, in all material respects, the financial condition of Spindletop and SSUGA, at the respective dates thereof, and the results of operations for the periods then ended in accordance with General Accepted Accounting Principles ("<u>GAAP</u>"), applied on a consistent basis throughout the periods indicated except as otherwise specifically noted therein. Seller has also provided Buyer with financial statements and audits for RFIC for the same time periods which were prepared on Statutory Accounting Principles that provided an even more detailed analysis of RFIC.

(b)     There are no liabilities or obligations of the Companies required to be reflected as liabilities in financial statements prepared in accordance with GAAP other than (i) liabilities or obligations reflected or reserved against in the balance sheet for the Most Recent Fiscal Period End included in the June 30, 2014 GAAP Statements, not heretofore discharged, or (ii) policyholder benefits payable or other liabilities arising after June 30, 2014 in the Ordinary Course of Business and in amounts consistent with past practice, none of which has had or is reasonably likely to have, individually or in the aggregate, a Material Adverse Effect. All reserve liabilities reflected in the GAAP Statements were determined in accordance with commonly accepted actuarial standards consistently applied except as noted therein, were fairly stated in accordance with sound actuarial principles, met the requirements of the insurance laws of the State of Texas, and, in the aggregate, each other jurisdiction in which RFIC is licensed to write insurance and reflected or will reflect, as applicable, the related reinsurance, coinsurance and other similar agreements of RFIC.

(c)     RFIC has paid in full or established reserves reflected in the GAAP Statements and in its statutory financial statements filed with applicable regulatory authorities for all guaranty or other similar state governmental fund assessments required by any governmental entity to be paid by RFIC prior to the date of this Agreement. As of the Effective Date and except as and to the extent paid prior to June 30, 2014 or reserved against in the GAAP Statements, RFIC has not received any guaranty fund assessments.

3.8     <u>Events Subsequent to Most Recent Fiscal Period End</u>.  Since the Most Recent Fiscal Period End, except as (i) set forth in Section 3.8 of the Disclosure Schedule, (ii) permitted or contemplated by this Agreement, or (iii) consented to by Buyer in writing, there has not been:

(a)     any transaction entered into or carried out by the Companies other than in the Ordinary Course of Business;

(b)     any material borrowing or agreement to borrow funds by the Companies, other than in the Ordinary Course of Business; any incurring by the Companies of any other material obligation or liability (contingent or otherwise), except obligations and liabilities incurred in the Ordinary Course of Business; or any endorsement, assumption or guarantee of payment or performance of any material loan or obligation of any other Person by the Companies;

(c)     any material change in any of the Companies' methods of doing business or any material change in its accounting principles or practices or its method of application of such principles or practices;

(d)     any material mortgage, pledge, lien, Security Interest, hypothecation, charge or other encumbrance imposed or agreed to be imposed on or with respect to the properties or assets of the Companies, other than in the Ordinary Course of Business;

(e)     any material lien, mortgage, Security Interest, pledge, hypothecation, charge or other encumbrance of the Companies discharged or satisfied, or any obligation or liability (absolute or contingent) paid, other than in the Ordinary Course of Business and liabilities incurred and obligations under contracts entered into after the Most Recent Fiscal Period End, in the Ordinary Course of Business;

(f)     any sale, lease or other disposition of, or any agreement to sell, lease or otherwise dispose of, any of the material properties or assets of the Companies, other than sales of inventory in the Ordinary Course of Business;

(g)     any increase in the base or bonus compensation to any director, officer or employee of the Companies, whether now or hereafter payable or granted (other than payment of bonuses or increases in base or bonus compensation in the Ordinary Course of Business), or entry into or amendments of the terms of any employment or incentive agreement with any such person;

(h)     any issuance or sale of any equity securities of the Companies (other than the exercise of any outstanding option or warrant to purchase Shares or the conversion of capital securities of one class into a different class of capital securities of the Companies), or any alteration of any terms of any outstanding equity securities of the Companies; or

8

(i)     any declaration or payment of any dividend or distribution (whether in cash, stock or property or otherwise) in respect of any Shares of the Companies.

3.9     <u>Regulatory Filings</u>.  Seller has made available for inspection by Buyer all reports, statements, documents, registrations, filings and submissions made by or with respect to RFIC with any governmental entity, and reports of examinations issued by any such governmental entity since June 30, 2014.  RFIC has timely filed, or caused to be timely filed, all material reports, statements, documents, registrations, filings, applications or submissions required to be filed by or on behalf of RFIC with any governmental entity in connection with the business conducted by RFIC, RFIC is acting in compliance in all material respects with all such reports, statements, documents, registrations, filings, applications and submissions, and all required regulatory approvals in respect thereof are in full force and effect. All such reports, statements, documents, registrations, filings, applications and submissions were in compliance in all material respects with Texas law when filed or as amended or supplemented and there were no material omissions therefrom, and no material deficiencies have been asserted by any governmental entity with respect to such reports, statements, documents, registrations, filings, applications or submissions that have not been satisfied.

3.10    <u>Tax Matters</u>.  Except as set forth on Section 3.10 of the Disclosure Schedule:

(a)     Mirage has filed or caused to be filed all significant Tax Returns required to be filed with respect to the Companies.  All such Tax Returns at the time of filing complied with all applicable Tax laws in all material respects.  All Taxes owed by the Companies shown on any Tax Return have been paid or have been adequately accrued on the books and records of the Companies, as applicable.  Mirage and the Companies are currently the beneficiary of a filing extension of time for the 2013 Tax Return. Mirage and the Companies are not currently beneficiaries of any other extension of time for any other Tax Return.  There are no Security Interests on the assets of the Companies that arose in connection with any failure or alleged failure to pay any Tax.

(b)     There is no dispute or claim concerning any Tax Liability of the Companies (i) claimed or raised by any Taxing authority in writing, or (ii) as to which Mirage has Knowledge based upon personal contact with any agent of such authority. Mirage has made available to Buyer true and correct copies of all federal income Tax Returns filed with respect to the Companies with respect to periods ending on or after December 31, 2010.

(c)     None of the Companies has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(d)     Except as set forth in Section 3.10 of the Disclosure Schedule, none of the Companies is a party to any Tax allocation or sharing agreement.

(e)     Except as set forth in Section 3.10 of the Disclosure Schedule, no audit of any Company's federal income Tax Return is currently pending.

3.11    <u>Real Property</u>.

(a)     <u>Owned Real Property</u>. Section 3.11(a) of the Disclosure Schedule lists all real property owned by the Companies as of the date of this Agreement.

9

(b)     Leased Real Property.  Section 3.11(b) of the Disclosure Schedule lists all real property leased or subleased to or by the Companies and the leases or subleases in respect thereof.  Mirage has made available to Buyer true and correct copies of the leases and subleases listed in Section 3.11(b) of the Disclosure Schedule.

3.12    Title to Assets.  Except as described in Section 3.12 of the Disclosure Schedule, each of the Companies has good title to, or a valid leasehold interest in, all material tangible, personal property assets used regularly in the conduct of its business, including all fixtures, furniture, equipment, machinery and leasehold improvements (the "Fixed Assets"), subject to no material liens, mortgages, pledges, encumbrances or charges, except as described in Section 3.12 of the Disclosure Schedule or such other exceptions which are not material in character, amount or extent and do not materially detract from the value of or interfere with the use of the tangible assets subject thereto or affected thereby.  All Fixed Assets are in good condition and repair, ordinary wear and tear excepted, except where the failure to be maintained in such good condition and repair would not have a Material Adverse Effect.

3.13    Intellectual Property.  Section 3.13 of the Disclosure Schedule identifies each patent, trademark, trade name, copyright and application therefor owned or licensed by or to the Companies, and identifies each license, agreement or other permission which any of the Companies has granted to any third party with respect to any of the foregoing.  The Companies each own (or possess enforceable licenses or other rights to use) all material patents, trademarks, trade names, copyrights, inventions, formulas and processes necessary to the operation of its business as presently conducted and, to the Knowledge of Mirage, such present use does not conflict with the lawful rights of others in any material respect.  No proceedings are pending or, to the Knowledge of Mirage, threatened which challenge the validity or the ownership by the Companies of the patents, trademarks, trade names, copyrights and applications set forth in Section 3.13 of the Disclosure Schedule.  To the Knowledge of Mirage, the sale of the Companies' products and services does not result in a material infringement of any U.S. patent owned by a third party.

3.14    Contracts.  Section 3.14 of the Disclosure Schedule lists the following contracts and other agreements (other than those of a type disclosed in another Section to the Disclosure Schedule) to which any of the Companies is a party:

(a)     each contract, agreement or commitment in respect of the sale of products, insurance, reinsurance, coinsurance, or the performance of services, or for the purchase of inventories, equipment, raw materials, supplies, services or utilities which (i) involves payments or receipts by the Companies of $50,000 or more and is not terminable by the Companies at any time upon notice of 90 days or less, or (ii) is not to be fully performed within one year from the date of this Agreement;

(b)     any material agreement for the lease of personal property to or from any Person providing for lease payments in excess of $50,000 per annum;

(c)     each partnership, joint venture, joint operating or similar agreement;

(d)     indebtedness for borrowed money, or any capitalized lease obligation, in excess of $500,000 or under which it has imposed a Security Interest on any of its assets, tangible or intangible;

10

(e)     any agreement concerning confidentiality or noncompetition;

(f)     any material agreement with Seller or an Affiliate of Seller;

(g)     any deferred compensation, severance or other plan or arrangement for the benefit of its directors, officers and employees;

(h)     any collective bargaining agreement;

(i)     any agreement under which any of the Companies has advanced or loaned money to directors, officers or employees outside the Ordinary Course of Business; and

(j)     any agreement restricting the right of the Companies to do business anywhere in the world.

Mirage has delivered to Buyer a true and correct copy of each written agreement listed in Section 3.14 of the Disclosure Schedule and a written summary setting forth the terms and conditions of each oral agreement referred to therein.  With respect to each such agreement: (i) to the Knowledge of Mirage, no party thereto is in material breach or default, and no event has occurred which with notice or lapse of time would constitute a material breach or default, or permit termination, material modification or acceleration, under the agreement; (ii) no party has repudiated any material provision of the agreement; and (iii) to the Knowledge of Mirage, with respect to the Companies, the agreement is legally valid and binding, except as enforcement may be limited by general principles of equity, whether applied in a court of law or a court of equity, and by bankruptcy, insolvency, moratorium or other similar laws affecting creditors' rights and remedies generally.

3.15    Insurance.  Section 3.15 of the Disclosure Schedule sets forth the following information with respect to each insurance policy to which any of the Companies is a party, a named insured, or otherwise the beneficiary of coverage:

(a)     the name of the insurer, the name of the policyholder and the name (or group designation) of each covered insured; and

(b)     the policy number and the period of coverage.

With respect to each such insurance policy, to the Knowledge of Mirage, the Companies are not in material breach or default (including with respect to the payment of premiums), and no claim for coverage has been denied. None of the Companies has received any notice of cancellation or intent to cancel or notice of increase or intent to increase premiums in any significant respect with respect to such insurance policies.

3.16    Material Litigation.  Section 3.16 of the Disclosure Schedule sets forth each instance in which any of the Companies (a) is subject to any outstanding injunction, judgment, order, decree, ruling or charge of any court of competent jurisdiction (of other than general application), or (b) is a party or, to the Knowledge of Mirage, is threatened in writing to be made a party, to any action, suit, proceeding, hearing or investigation of, in or before any court or administrative agency of any federal, state, local or foreign jurisdiction or before any arbitrator, seeking either (i) injunctive or similar relief, or (ii) damages in excess of $250,000.  There is no claim, litigation, action, arbitration, suit, or judicial proceeding pending or, to the Knowledge of

11

Mirage, threatened in writing, nor any governmental investigation pending or to the Knowledge of Mirage threatened in writing, against any of the Companies, at law or equity, before any federal, state or local court or regulatory agency, or other governmental authority, which is reasonably likely to have a Material Adverse Effect.

3.17   Labor and Employment Matters.

(a)     The Companies are in compliance in all material respects with all Applicable Laws respecting employment and employment practices and terms and conditions of employment, other than such noncompliance as would not have a Material Adverse Effect.

(b)     No union representation exists with respect to the employees of the Companies and, to the Knowledge of Seller, no union organizing activities are currently taking place.

(c)     Set forth in Section 3.17(c) of the Disclosure Schedule is a list of all the current employees of each of the Companies.

3.18   Employee Benefits.   Except as set forth in Section 3.18 of the Disclosure Schedule, none of the Companies is obligated under or a party to any profit-sharing, deferred compensation, bonus, equity option, equity ownership, equity purchase, phantom stock, pension, multiemployer, employment, consulting, retirement, welfare, cafeteria or incentive plan, or any plan or agreement or practice providing for "fringe benefits" to its employees or former employees, including, but not limited to, vacation, sick leave, salary continuation, service awards, severance pay, welfare, medical, post-retirement medical, hospitalization, disability, life insurance, other insurance plans, or related benefits.   None of the Companies is a member of a controlled group of companies or a controlled group of trades or businesses as described in Section 414(b) and 414(c), respectively, of the Code, or Section 4001 of ERISA.   Except as set forth in Section 3.18 of the Disclosure Schedule, (a) each employee benefit plan and any trust maintained in connection therewith, intending to qualify under Sections 401 and 501 of the Code so qualifies, and to the Knowledge of Mirage no event has occurred which would cause such plan or trust to fail to qualify under Sections 401 and 501 of the Code, (b) there are no actions, suits or claims (other than routine claims for benefits in the ordinary course) pending or, to the Knowledge of Mirage, threatened with respect to any such plans, which could have a Material Adverse Effect, or such plan, and (c) each of the Companies has complied in all material respects with the administration, reporting and substantive requirements of ERISA and the Code with respect to each of such plans.

3.19   Guaranties.   Except as set forth in Section 3.19 of the Disclosure Schedule, none of the Companies is a guarantor for any Liability or obligation (including indebtedness) of any other Person.

3.20   Environment, Health and Safety.   Except as set forth in Section 3.20 of the Disclosure Schedule, to the Knowledge of Mirage:

(a)     The Companies have been, and currently are, in compliance in all material respects with all Environmental, Health and Safety Laws, and there is no contingent liability relating to any Environmental, Health and Safety Laws, except for any such noncompliance or liability that would not have a Material Adverse Effect.

12

(b)    No action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand or notice has been filed or commenced or threatened against the Companies alleging a failure to comply with Environmental, Health, and Safety Laws.

3.21    Certain Business Relationships with the Companies.   Except as described in Section 3.21 of the Disclosure Schedule, neither Seller nor its Affiliates has been involved in any material business arrangement or relationship with the Companies within the past 12 months and neither Seller nor its Affiliates (other than the Companies) owns any material asset, tangible or intangible, which is used in the business of the Companies.

3.22    Stock Records.   The stock or membership interest books and records of the Companies accurately reflect all transactions in the capital securities of the Companies since their respective dates of incorporation.

3.23    Labor Relations.   To the Knowledge of Mirage, (i) there is no unfair labor practice complaint against any of the Companies pending before any governmental authority, and (ii) there is no labor strike, dispute, slowdown or stoppage, or any union-organizing effort or campaign, pending against or involving any of the Companies.

3.24    Customers.   Except as set forth in Section 3.24 of the Disclosure Schedule, to the Knowledge of Mirage none of the Companies' material customers have given written notice to any of the Companies that any material contracts or orders will be terminated or canceled prior to their expiration date.

3.25    Licenses and Permits.   Section 3.25 of the Disclosure Schedule sets forth a true, complete and accurate list of all licenses, approvals, permits or authorizations from governmental authorities required to be maintained for the businesses and operations of the business of the Companies.

ARTICLE 4
REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller, as of the Effective Date and as of the Closing (unless such representation or warranty is as of a specified date and then solely as of such date), as follows:

4.1    Organization of Buyer.   Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Florida and is duly qualified to do business in each jurisdiction in which Buyer owns or leases any property, maintains an office or has employees residing, except where the failure to be so qualified would not have a Material Adverse Effect on the business or financial condition of Buyer.

4.2    Authorization of Buyer.   Buyer has the requisite corporate power and authority to execute and deliver this Agreement, and the other agreements contemplated herein, and to perform its obligations hereunder and thereunder.  This Agreement, and the other agreements contemplated herein, have been duly authorized by all requisite corporate action of Buyer and constitutes, and upon execution by the other Parties hereto and thereto, will constitute, the valid and legally binding obligations of Buyer, enforceable in accordance with its terms and conditions, except as enforcement may be limited by general principles of equity, whether

13

applied in a court of law or a court of equity, and by bankruptcy, insolvency, moratorium or other similar laws affecting creditors' rights and remedies generally.

4.3     Noncontravention.  Neither the execution and delivery of this Agreement, and the other agreements contemplated hereby, nor the consummation of the transactions contemplated hereby and thereby, will (i) violate any statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency or court to which Buyer is subject or any provision of its Governing Documents, or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any agreement, contract, lease, license or instrument to which Buyer is a party or by which it is bound or to which any of its assets is subject.  Except for the filings required by the TDI, Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any government or governmental agency for the Parties to consummate the transactions contemplated by this Agreement.

4.4     Brokers' Fees.  Buyer has no Liability or obligation to pay any finder's fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Seller could become liable or obligated.

4.5     Investment Representations.

(a)     Buyer acknowledges that the Shares have not been registered for offer or sale under the Securities Act or any state securities laws, are not listed for trading on any stock exchange, stock quotation service or other stock market and are not part of a class of securities registered under the Exchange Act.  Buyer understands that the Shares (A) are being sold to Buyer in reliance on exemptions from the registration requirements of the Securities Act and any applicable state securities laws; (B) are "restricted securities" within the meaning of Rule 144 promulgated under the Securities Act; and (C) may not be sold, transferred or otherwise disposed of unless subsequently registered under the Securities Act and applicable state securities laws or unless an exemption from registration is available.

(b)     Buyer has such knowledge and experience in financial and business matters in general and with respect to businesses of a nature similar to the business of the Companies so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, the acquisition of the Shares.  Buyer is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act.

(c)     Buyer is acquiring the Shares solely for its own account and not with a view to or for resale in connection with any distribution or public offering thereof, within the meaning of applicable securities laws and regulations.

(d)     To the extent it believes appropriate prior to the signing of this Agreement, Buyer (A) has received all the information it has deemed necessary to make an informed investment decision with respect to the execution of this Agreement and the acquisition of the Shares; (B) has had the opportunity to conduct adequate due diligence and review the information provided or made available to it by Seller; (C) has had the unrestricted opportunity to make such investigation as it has desired pertaining to the

14

Companies and the acquisition of the Shares and to verify the information that is, and has been made, available to it; and (D) has had the opportunity to ask questions of Seller regarding the business operations and financial condition of the Companies.

4.6     Financing.   Buyer has sufficient funds available, through firm financing commitments or otherwise, to purchase the Shares pursuant to this Agreement without violating any solvency requirements currently applicable to Buyer.  Buyer has previously supplied to Seller its bank statements dated as of a date not earlier than June 30, 2014.

4.7     Absence of Litigation.  Buyer is not a party to any, and there are no pending or threatened proceedings against, Buyer challenging the validity of the transactions contemplated by this Agreement which, if determined adversely, would prevent the consummation of the transactions contemplated by this Agreement.

4.8     No Knowledge of Misrepresentations or Omissions.  Buyer has no knowledge that any of the representations and warranties of Seller in this Agreement and the Disclosure Schedule are untrue or incorrect in any material respect, and Buyer has no knowledge of any material errors in, or material omissions from, the Disclosure Schedule.

4.9     No Other Representations.  Buyer acknowledges and agrees that it has conducted its own independent review and analysis of (i) the Shares; and (ii) the business, assets, condition, operations and prospects of the Companies.  In entering into this Agreement, Buyer has relied solely upon its own investigation and analysis and the representations and warranties of Seller set forth in this Agreement, and Buyer acknowledges that, other than as set forth in Article 2 and Article 3 of this Agreement, neither Seller nor any of the Companies nor any of their respective directors, officers, employees, Affiliates, stockholders, agents or representatives makes or has made any representation or warranty, either express or implied, as to the Shares, or as to the Companies or their assets and properties, the results of their operations, their liabilities, the conduct of their respective businesses, the accuracy or completeness of any of the information (including, without limitation, projections, forecasts, budgets and estimates) provided or made available to Buyer, its officers, directors, employees, agents, representatives, Affiliates and financing sources prior to the execution of this Agreement.  Specifically, Buyer shall not be entitled to rely on, or seek damages for Adverse Consequences under Article 8 or otherwise, for any information provided to Buyer or its representatives, Affiliates or financing sources by any Affiliate, stockholder or representative of Seller that is not expressly set forth in Article 2 or Article 3 of this Agreement or in the Disclosure Schedules.

ARTICLE 5
PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the Effective Date and the Closing:

5.1     General; Timing of Closing.  Each of the Parties will use Reasonable Best Efforts to take all action and to do all things necessary to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth in Article 7).  Each of the Parties will use Reasonable Best Efforts to cause the satisfaction of all closing conditions set forth in Article 7 on or before November 16, 2014.

15

5.2     Notices and Consents.  Seller will cause the Companies to give any notices to third parties and to use its Reasonable Best Efforts to obtain any third party consents that are required pursuant to the terms of any material agreement or contract listed in Section 3.14 of the Disclosure Schedule.  Buyer and Seller will give any notices, make any filings with, and use their Reasonable Best Efforts to obtain any authorizations, consents and approvals of governments and governmental agencies in connection with the matters referred to in Section 2.22, Section 3.3 and Section 4.3.  Without limiting the generality of the foregoing, Buyer and Seller each will promptly make all required filings, if applicable, as required by the TDI.  In the event that a request for additional information is made of Buyer or Seller pursuant to the Texas Insurance Code, Buyer or Seller, as the case may be, shall use Reasonable Best Efforts (and Mirage will cause RFIC to use Reasonable Best Efforts) to comply with such request as soon as practicable after receipt of such request.

5.3     Operation of Business.  Seller will not cause or permit the Companies to (i) change or amend their Governing Documents, (ii) merge or consolidate with any other Person or acquire a material amount of assets of any other Person, or (iii) enter into any transaction outside the Ordinary Course of Business.

5.4     Preservation of Business.  Seller will cause the Companies to (a) use Reasonable Best Efforts to keep their respective businesses and properties substantially intact, including their present operations, physical facilities, working conditions and relationships with lessors, licensors, suppliers, customers and employees, and (b) conduct the business, operations, activities and practices of the Companies in the Ordinary Course of Business (except to the extent otherwise contemplated or permitted by this Agreement).

5.5     Full Access.  Prior to the Closing, Mirage will cause the Companies to permit Buyer and its attorneys, accountants and representatives to have full access on an ongoing basis, and as requested by Buyer upon reasonable notice to Mirage during normal business hours, but only in a manner so as not to interfere with the normal business operations of the Companies, to the premises, properties, personnel, books, records, contracts and documents of or pertaining to the Companies.  Seller shall use commercially reasonable efforts to ensure that the information and access provided is accurate, current and updated at the time such information and access is provided, and shall permit Buyer and its attorneys, accountants and representatives to consult with and ask questions of the officers, directors, employees, vendors, accountants, agents, consultants and representatives of Mirage and/or the Companies; provided, however, that Buyer shall be required to be accompanied by a representative of Mirage, or the Companies, as the case may be, at all times upon the Companies' premises.  Mirage will cause the Companies to also cooperate with and assist Buyer in discussions with insurance and other regulators regarding the condition of the Companies and compliance with insurance laws and regulations.  Buyer will comply with the terms and conditions of the Non-Disclosure Agreement with respect to any Confidential Information (as defined in the Non-Disclosure Agreement) received from Mirage or the Companies in the course of the reviews contemplated by this Section 5.5 and will not use any such Confidential Information except in connection with this Agreement or as permitted by the Non-Disclosure Agreement, and, if this Agreement is terminated for any reason whatsoever, Buyer will return accordingly to Mirage and/or the Companies, or destroy (and upon request certify such destruction in writing to Mirage or the Companies) all tangible embodiments (and all copies) of the Confidential Information which are in its possession.  In the event of any conflict between the terms of this Section 5.5 and the Non-Disclosure Agreement, the terms of this Agreement will be controlling.

16

5.6     Notice of Developments.  Each Party will give prompt written notice to the other of any development causing a material breach of any of its representations and warranties in Articles 2, 3 or 4.  No disclosure by a Party pursuant to this Section 5.6, however, shall be deemed to amend or supplement the Disclosure Schedule or to prevent or cure any misrepresentation, breach of warranty or breach of covenant, except to the extent included in one or more Disclosure Schedule Updates contemplated by Section 5.7 and accepted or deemed accepted by Buyer pursuant thereto.

5.7     Disclosure Schedule Update.

(a)     At any time prior to the Closing, Mirage may deliver to Buyer one or more amendments or supplements to the Disclosure Schedule (each a "Disclosure Schedule Update") to correct any matter or matters that Seller becomes aware of (either on its own or by being informed by Buyer) that would constitute a breach of any representations or warranties contained in Articles 2 or 3 hereof.  Unless Buyer reasonably and in good faith believes any Disclosure Schedule Update reflects new or changed information that indicates a Material Adverse Effect, and chooses not to accept the Disclosure Schedule Update by giving written notice of such non-acceptance to Seller within the first to occur of (i) the expiration of two (2) business days of receipt of the Disclosure Schedule Update, or (ii) the Closing Date, Buyer shall be deemed to have accepted and acknowledged the Disclosure Schedule Update, and for all purposes under this Agreement the Disclosure Schedule Update shall be deemed to supersede and amend the pertinent portion so supplemented and amended of the original Disclosure Schedule dated as of the Effective Date (and all references herein to the Disclosure Schedule shall mean the Disclosure Schedule as amended and supplemented pursuant to this Section 5.7(a)).

(b)     If Buyer reasonably and in good faith believes the Disclosure Schedule Update reflects new or changed information that indicates a Material Adverse Effect, and Buyer provides written notice to Seller within the time period prescribed in Section 5.7(a), Buyer may elect to terminate this Agreement if and to the extent permitted by Section 12.1(b) hereof.

(c)     If, at any time up to and including the Closing Date, Buyer has knowledge that (i) any representation or warranty being made herein or at Closing by Seller is misleading, untrue or incorrect or (ii) Seller has not performed or complied in any material respect with any agreements or covenants required by this Agreement to be performed or complied with by Seller, then Buyer shall promptly give written notice to Seller setting forth with reasonable specificity the matter alleged to be misleading, untrue or incorrect or the matter that has not been performed or complied with.  Such notification shall be given as soon as reasonably practicable after Buyer has knowledge that notice hereunder is required.  If the required notice is not given by Buyer, then all such matters of which Buyer has knowledge shall be deemed waived irrevocably for all purposes under this Agreement and no claim whatsoever, whether for indemnification under this Agreement, or for damages or otherwise, may be made by Buyer against Seller as a consequence of a breach of such representation or warranty or the failure to perform or comply with such agreement or covenant.

5.8     Compensation Arrangements.  Except as otherwise contemplated or permitted by this Agreement or as set forth in Section 5.8 of the Disclosure Schedule, Mirage shall not permit

17

any of the Companies to enter into or materially modify any employee arrangements, grant bonuses, increase salaries or improve severance or termination pay, except in the Ordinary Course of Business.

     5.9    Employees; Consultants.

     (a)    Immediately prior to the Closing, Mirage shall cause each of the Companies to terminate the employees listed on Section 5.9(a) of the Disclosure Schedule, effective as of the Closing.

     (b)    Buyer, or an Affiliate, shall offer an employment contract substantially in the form of Exhibit A to the employees of Seller listed on Section 5.9(b) of the Disclosure Schedule.

     (c)    At Closing, Buyer will make a cash contribution to the Simplified Employee Pension program for those employees listed on Section 5.9(c) of the Disclosure Schedule in amounts to be equal to five percent (5.0%) of each such employee's base salary immediately prior to Closing.

     (d)    If Buyer determines, in its sole discretion, that it requires such services, Buyer and Seller shall execute and deliver a Consulting Agreement at Closing in a form to be agreed upon by the Parties between the Effective Date and the Closing Date.

     5.10    Office Lease.  At Closing, Mirage will terminate the lease agreement with Beaumont Preservation Partners, LLC, and Buyer shall enter into an office lease with Beaumont Preservation Partners, LLC substantially similar to the lease form which is attached hereto and acknowledged by the Parties (the "Lease") for the office space currently occupied by the Companies, and the Lease will include the right to use certain furniture and equipment owned by Mirage and Affiliates to be described therein.

ARTICLE 6
POST-CLOSING COVENANTS

The Parties agree as follows with respect to the period following the Closing:

     6.1    General.  If at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will take, or cause to be taken, such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under Article 8).  Seller acknowledges and agrees that from and after the Closing, Buyer will be entitled to possession of all documents, books, records, agreements and financial data relating to the Companies; provided, however, that after Closing upon request Buyer shall cause the Companies to provide Seller with true, complete and correct copies of any of the foregoing at the respective Company's sole expense for any proper purpose (including preparation of Tax Returns and responding to any audits by Taxing authorities).

     6.2    Indemnification.  Buyer shall cause the Companies to keep in effect provisions in their respective Governing Documents with respect to indemnification no less favorable to directors and officers than those contained therein on the Effective Date, which provisions shall

18

not be amended, repealed or otherwise modified for a period of at least six years from the Closing in any manner that would adversely affect the rights thereunder of individuals who at any time prior to the Closing were directors or officers of the Companies in respect of actions or omissions at or prior to the Closing (including the transactions contemplated by this Agreement), except as required by applicable law.

6.3     Mutual Cooperation.

(a)     Tax Returns for Periods Ending on or Prior to Closing Date, Filed After Closing Date.  Seller shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for the Companies for all periods ending on or prior to the Closing Date, including the 2014 stub period, which are to be filed after the Closing Date.  Buyer shall be permitted to review, comment and approve each such Tax Return described in the preceding sentence prior to filing, which approval Buyer will not unreasonably withhold. All such Tax Returns shall be prepared in a manner consistent with the past custom and prior practice of the Companies unless specifically required by Applicable Law.

(b)     Tax Periods Beginning After the Closing Date.  Buyer shall prepare or cause to be prepared and file or cause to be filed any Tax Returns of the Companies for tax periods which begin after the Closing Date.  Seller shall be permitted to review, comment and approve any portion of each such Tax Return related to taxable periods ending on or prior to the Closing Date prior to filing, which approval Seller will not unreasonably withhold or delay.  For purposes of this Section, in the case of any Taxes that are imposed on a periodic basis and are payable for a taxable period that includes (but does not end on) the Closing Date, the portion of such Tax that relates to the portion of such taxable period ending on the Closing Date shall (i) in the case of any Taxes other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in the entire taxable period, and (ii) in the case of any Tax based upon or related to income or receipts be deemed equal to the amount which would be payable if the relevant taxable period ended on the Closing Date.  Any credits relating to a taxable period that begins before and ends after the Closing Date shall be taken into account as though the relevant taxable period ended on the Closing Date.     All determinations necessary to give effect to the foregoing allocations shall be made in a manner consistent with past custom and prior practice of the Companies.

(c)     Cooperation on Tax Matters.

(i)     Seller shall cooperate fully and Buyer shall cause the Companies to cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns pursuant to this Section and any audit, litigation or other proceeding with respect to Taxes.  Such cooperation shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  Buyer agrees to retain all books and records with respect to Tax matters pertinent to the Companies relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations

(and any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority.

(ii)     Buyer and Seller further agree, upon request, to provide the other Party with all information that either Party may be required to report pursuant to the Code and all Treasury Department Regulations promulgated thereunder.

(d)     <u>Refunds; Tax Benefits; Tax Liabilities</u>.   If any Tax refunds that are received by Buyer or the Companies, or any amounts credited against Taxes to which Buyer or the Companies become entitled, that relate to Tax periods or portions thereof ending on or before the Closing Date exceeds the portion, if any, of such refunds or credited amounts that were included as assets receivable in the Most Recent Financial Statements, Buyer shall pay over to Mirage any such excess, within fifteen (15) days after receipt or entitlement thereto, net of any Taxes imposed upon Buyer by reason of the receipt of such excess. If any Tax liabilities that are imposed upon Buyer or the Companies, or any amounts assessed against Taxes to which Buyer or the Companies become obligated, that relate to Tax periods or portions thereof ending on or before the Closing Date exceeds the portion, if any, of such liabilities or assessments that were included as taxes payable in the Most Recent Financial Statements, Mirage shall pay over to Buyer any such excess, within fifteen (15) days prior to the due date thereof.   The parties intend that any payments from Buyer to Seller, or amounts due from Seller to Buyer, under this <u>Section 6.3(d)</u> shall be treated as an adjustment to the Purchase Price of the Shares for purposes of all applicable Laws, including Tax Laws.

(e)     <u>Tax Audits</u>.    Buyer agrees (i) to furnish to Mirage copies of all correspondence received from any governmental entity in connection with any audit, litigation or other proceedings relating to the Tax Returns of the Companies for taxable periods beginning prior to the Closing Date, and (ii) to cooperate, to the extent reasonably requested by Mirage, in connection with any audit, litigation or other proceedings in respect to the Taxes of the Companies. Mirage, in its sole discretion, shall have the right to participate in or control any audit, examination, litigation or other proceedings by any governmental entity and contest and defend against any assessment, notice of deficiency or other adjustment or proposed adjustment relating to or with respect to Taxes or Tax Returns for any period ending on or prior to the Closing Date and shall have full control over the resolution or settlement of any such matters; provided, however, that in the event that any such adjustment would have an adverse effect on the Companies for a period ending after the Closing Date, Mirage (i) shall permit Buyer to participate in the proceeding to the extent the adjustment may affect the Tax liability of the Companies for a period ending after the Closing Date, and (ii) shall not settle or otherwise compromise such proceeding without the prior written consent of Buyer, which shall not be unreasonably withheld or delayed.  To the extent Mirage does not assume full control over any such matters, Buyer shall use best efforts to defend positions taken on Tax Returns for periods ending on or prior to the Closing Date and shall keep Mirage informed of the progress of any such proceedings and shall not settle or otherwise compromise such proceeding without the prior written consent of Mirage, which shall not be unreasonably withheld or delayed.  To the extent that any assessment, notice of deficiency or other adjustment or proposed adjustment related to or with respect to the Tax Returns for any taxable period other than a period ending on or prior to the Closing Date would require indemnification hereunder, Buyer (A) shall permit Mirage to

participate in the proceeding, and (B) shall not settle or otherwise compromise such proceeding without the prior written consent of Mirage, which shall not be unreasonably withheld or delayed.

## ARTICLE 7
## CONDITIONS TO OBLIGATION TO CLOSE

7.1     Conditions to Obligation of Buyer.  The obligation of Buyer to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(a)     (i) The representations and warranties of Seller contained in this Agreement that are qualified as to Material Adverse Effect shall be true and correct as of the date of this Agreement and as of the Closing Date (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made; and (ii) the representations and warranties of Seller contained in this Agreement that are not qualified as to Material Adverse Effect shall be true and correct as of the date of this Agreement and as of the Closing Date (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made, except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  If Seller shall have delivered one or more Disclosure Schedule Updates and Buyer has not terminated this Agreement in accordance with Section 12.1(b), such Disclosure Schedule Update(s) will be deemed to modify the Disclosure Schedule and the disclosures therein will be given effect for purposes of determining the accuracy of Seller's representations and warranties;

(b)     Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(c)     Seller shall have delivered to Buyer a certificate to the effect that each of the conditions specified in Sections 7.1(a) and (b) have been satisfied;

(d)     no action, suit, or proceeding shall be pending or, to the Knowledge of Seller, threatened in writing before any federal or state court of competent jurisdiction wherein an unfavorable injunction, judgment, order, decree, ruling or charge has been or is reasonably likely to be issued (i) preventing consummation of the transactions contemplated by this Agreement, or (ii) causing the transactions contemplated by this Agreement to be rescinded following consummation;

(e)     all required TDI filings, including but not limited to approval of the Form A for RFIC, shall have been made and any applicable waiting period (and extensions thereof) under the Texas Insurance Code shall have expired or terminated;

(f)     there has not been a Material Adverse Effect with respect to Seller or the Companies;

21

(g)     the Secretary of each of the Companies shall have delivered to Buyer a certificate, dated as of the Closing Date, certifying as to its (i) Certificate of Incorporation; and (ii) Bylaws; and

(h)     all other material governmental approvals or consents, if any, required by Applicable Law, and all applicable third party consents, if any, required under any material contract to which any of the Companies is a party identified in Section 3.14 of the Disclosure Schedule, for the consummation of the transactions contemplated by this Agreement, shall have been received, satisfied or waived.

Buyer may waive any condition specified in this Section 7.1 if it executes a writing so stating at or prior to the Closing.

7.2     Conditions to Obligation of Seller.  Seller's obligation to consummate the transactions to be performed by Seller in connection with the Closing is subject to satisfaction of the following conditions:

(a)     (i) The representations and warranties of Buyer contained in this Agreement that are qualified as to Material Adverse Effect shall be true and correct as of the date of this Agreement and as of the Closing Date (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made; and (ii) the representations and warranties of Buyer contained in this Agreement that are not qualified as to Material Adverse Effect shall be true and correct as of the date of this Agreement and as of the Closing Date (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made, except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Buyer;

(b)     Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(c)     Buyer shall have delivered to Seller a certificate executed by a senior executive officer of Buyer to the effect that each of the conditions specified in Sections 7.2(a) and (b) have been satisfied;

(d)     no action, suit, or proceeding shall be pending before any federal or state court of competent jurisdiction wherein an unfavorable injunction, judgment, order, decree, ruling or charge has been or is reasonably likely to be issued (i) preventing consummation of the transactions contemplated by this Agreement, or (ii) causing any of the transactions contemplated by this Agreement to be rescinded following consummation; and

(e)     all required TDI filings, including but not limited to approval of the Form A for RFIC, shall have been made and any applicable waiting period (and extensions thereof) under the Texas Insurance Code shall have expired or terminated.

Seller may waive any condition specified in this Section 7.2 if Seller executes a writing so stating, at or prior to the Closing.

ARTICLE 8

INDEMNIFICATION

8.1     <u>Survival of Representations and Warranties</u>.  Subject to Article 9 and Article 10, all covenants, agreements, representations and warranties made by Seller and Buyer pursuant to this Agreement shall be deemed to have survived the Closing and shall remain effective.

8.2     <u>Indemnification Provisions for Benefit of Buyer</u>.  Subject to Article 9 and Article 10, following the Closing, Seller shall indemnify and save and hold Buyer harmless from and against any Adverse Consequences suffered or incurred by Buyer (provided that Seller's obligations hereunder shall be subject to the limitations set forth in Article 9) arising out of or resulting from:

(a)     the inaccuracy in any representation or the breach of any warranty made by Seller in this Agreement; or

(b)     the failure of Seller duly to perform or observe any covenant or agreement in this Agreement required on the part of Seller to be performed or observed by it pursuant to this Agreement.

8.3     <u>Indemnification Provisions for Benefit of Seller</u>.  Following the Closing, Buyer shall indemnify, save and hold harmless Seller from and against any Adverse Consequences suffered or incurred by Seller arising out of or resulting from:

(a)     the inaccuracy  in any representation or the breach of any warranty made by Buyer in this Agreement; or

(b)     the failure of Buyer duly to perform or observe any covenant or agreement in this Agreement required on the part of Buyer to be performed or observed by it pursuant to this Agreement.

8.4     <u>Exclusive Remedy</u>.  This Article 8, as limited by the provisions of Article 9 and Article 10, constitutes the Buyer's and Seller's sole and exclusive remedy for all Adverse Consequences or other claims (excluding any actions for specific performance) relating to or arising from this Agreement, any of the agreements, documents and instruments executed and delivered in connection herewith and the transactions contemplated by any of the foregoing. Neither the Buyer nor the Seller may avoid such limitation on liability by seeking damages for breach of contract, tort or pursuant to any other theory of liability, other than claims based on fraud.  Except as otherwise provided in this Section 8.4 or for claims based on fraud, no claim shall be brought or maintained by Buyer or its Affiliates, successors or permitted assigns against Seller, its successors or permitted assigns and no recourse shall be brought or granted against Seller, by virtue of or based upon any alleged misrepresentation or inaccuracy in or breach of any of the representations, warranties or covenants of Seller or any other Person set forth or contained in this Agreement, or any of the agreements, documents and instruments executed and delivered in connection herewith or therewith, the subject matter of this Agreement, any information, document or material furnished or made available to Buyer in "data rooms," management presentations or in any other form in anticipation of or in connection with the

23

transactions contemplated by this Agreement, the ownership, operation, management, use, control of, and other actions or omissions with respect to, the business of the Companies, any of their assets, any of the transactions contemplated hereby or any other actions or omissions at or prior to the Closing Date.   Buyer and its Affiliates, successors and permitted assigns hereby irrevocably waive all such claims of any type or description and hereby agree to indemnify and hold harmless Seller from and against and in respect of all Adverse Consequences and other losses incurred by Seller as a result of any such claim brought or maintained by any such party against Seller in contravention of this Section 8.4.   EACH PARTY EXPRESSLY WAIVES ALL RIGHTS AFFORDED BY ANY STATUTE WHICH LIMITS THE EFFECT OF A RELEASE WITH RESPECT TO UNKNOWN CLAIMS.   EACH PARTY UNDERSTANDS THE SIGNIFICANCE OF THIS RELEASE OF UNKNOWN CLAIMS AND WAIVER OF STATUTORY PROTECTION AGAINST A RELEASE OF UNKNOWN CLAIMS.   EACH PARTY ACKNOWLEDGES AND AGREES THAT THIS WAIVER IS AN ESSENTIAL AND MATERIAL TERM OF THIS AGREEMENT.   For purposes of this Agreement, Adverse Consequences from "fraud" shall not be deemed to have been suffered or incurred by Buyer unless such Adverse Consequences were caused by a representation and warranty of Seller in this Agreement that was (a) false, (b) positively asserted with the Knowledge of the Seller of its falsity when made, (c) made by Seller with the intent that it be acted upon by Buyer, and (d) relied upon by Buyer.

## ARTICLE 9
## LIMITATIONS ON INDEMNIFICATION

9.1   Term.

(a)   Any rights of Buyer to indemnification under this Agreement (including under Section 8.2) shall apply only to those claims written notice of which shall have been delivered by Buyer to Seller on or before 12 months from the Closing Date.

(b)   Any rights of Seller to indemnification under this Agreement (including under Section 8.3) shall apply only to those claims written notice of which shall have been delivered by Seller to Buyer on or before 12 months from the Closing Date.

(c)   Notwithstanding anything in this Article 9 to the contrary, (i) the representations and warranties contained in Section 3.2 (Capitalization) shall survive indefinitely, and (ii) the covenants of the Parties shall survive according to their respective terms.

9.2   Indemnification Basket.   Any right of Buyer to indemnification under this Agreement shall not apply to any claim until the aggregate of all such claims which have become final totals at least $40,000 in which event such indemnity shall apply to all such claims which become final.   This requirement shall not be deemed to be a deductible against the amount of damages that may be recovered and any such damages shall be recoverable on a first dollar basis.

9.3   Limited Recourse.   Notwithstanding anything to the contrary in this Agreement, all rights of Buyer to indemnification by Seller under this Agreement (including under Section 8.2) shall be limited to the maximum amount of the Purchase Price adjustment of $500,000.00 as described in Section 1.3.

24

ARTICLE 10
COOPERATION

10.1   Notice of Claims.  Each Party will give prompt written notice to the other Parties of any claim by a third party or by any governmental body, or any legal, administrative or arbitration proceeding ("Third Party Claim") which such Party ("Indemnified Party") discovers or of which it receives notice after the Closing and which may give rise to a claim against any other Party or Parties ("Indemnifying Party") under Sections 8.2 or 8.3, as the case may be.  All notices shall state in reasonable detail the nature, basis and amount (to the extent reasonably ascertainable) of such Third Party Claim.  No delay on the part of the Indemnified Party in notifying the Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder unless (and then, subject to this Article 10, solely to the extent) the Indemnifying Party thereby is prejudiced.

10.2   Right to Defense.

(a)   The Indemnifying Party shall have the right to defend the Indemnified Party against the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party so long as the Indemnifying Party notifies the Indemnified Party in writing within fifteen (15) days after the Indemnified Party has given notice of the Third Party Claim that the Indemnifying Party will, subject to the limitations set forth in Article 9, indemnify the Indemnifying Party from and against any Adverse Consequences the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim.  After notice by the Indemnifying Party to the Indemnified Party of its election to assume the defense of any Third Party Claim, the Indemnifying Party will not, as long as it diligently conducts such defense, be liable to the Indemnified Party for any fees of other counsel or any other expenses with respect to the defense of the Third Party Claim in each case subsequently incurred by the Indemnified Party in connection with the defense of such Third Party Claim.  The Indemnified Party shall make available to the Indemnifying Party, their attorneys and accountants, at all reasonable times, all books and records of the Indemnified Party or the Companies, as the case may be, relating to any Third Party Claim, and the Parties will render to each other such assistance as may reasonably be required in order to insure proper and adequate defense of any Third Party Claim.

(b)   So long as the Indemnifying Party is conducting the defense of the Third Party Claim, the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim.  The Indemnifying Party shall not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party unless (i) such judgment or settlement does not involve an injunction or other equitable relief, and (ii) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party.  The Indemnifying Party will have no liability or additional expense with respect to any compromise or settlement of any Third Party Claim effected without its prior written consent.

10.3    Calculation of Amounts; Other Limitations.

(a)    The amounts for which an indemnifying party shall be liable under Article 8 shall be net of any: (i) Tax Benefit realized by a party to be indemnified in respect of such party's Adverse Consequences; (ii) insurance proceeds received by a party to be indemnified in respect of such party's Adverse Consequences; and (iii) any amounts recovered or recoverable by the party to be indemnified pursuant to any indemnification by or indemnification agreement with any third party.  In no event shall Adverse Consequences under Article 8 include any incidental, consequential, lost profits or punitive damages.  To the extent that indemnity payments under Article 8 would not give rise to a currently realized Tax Benefit but would reasonably be expected to give rise to a subsequently realized Tax Benefit to the party to receive such indemnity payment, then such indemnity payment shall be reduced by the present value of such to be realized Tax Benefit, using the Applicable Federal Rate to determine such present value.  For purposes of this Agreement, a "Tax Benefit" means the reduction of Tax liabilities resulting from an increase in deductions, losses or tax credits or decrease in the income, gains or recapture of tax credits that the party to be indemnified would have reported or taken into account in the current taxable or a future taxable period subsequent to the Closing Date had the indemnity payment not been made.

(b)    Without prejudice to the rights of the Buyer to be indemnified, held harmless and reimbursed when and as required by Article 8, if any Adverse Consequences sustained by the Buyer are covered by an insurance policy or an indemnification obligation of another Person (other than an Affiliate of Buyer), the Buyer shall use commercially reasonable efforts to collect such insurance or indemnity payments.  If the Buyer receives such insurance or indemnity payments prior to being indemnified, held harmless and reimbursed with respect to such Adverse Consequences, the payment with respect to such Adverse Consequences shall be reduced (but not below zero) by the amount of such insurance proceeds or indemnity payments to the extent related to such Adverse Consequences, net of attorneys' fees and other expenses incurred in connection with such recovery.  If the Buyer receives such insurance proceeds or indemnity payments after being indemnified and held harmless with respect to such Adverse Consequences, the Buyer shall pay promptly to the Seller (up to a maximum of the total amount paid to the Buyer in respect of such Adverse Consequences) the amount of such insurance proceeds or indemnity payments to the extent related to such Adverse Consequences, net of attorneys' fees and other expenses incurred in connection with such recovery.  For purposes of this Section 10.3, the Buyer shall not be deemed to have received an insurance payment if such payment is made under an insurance plan or program that is self-funded by Buyer or its Affiliates.  If Buyer receives an indemnity payment on account of a claim for Adverse Consequences that Seller believes in good faith is covered by an insurance policy or an indemnification obligation of another Person (other than an Affiliate of Buyer), Buyer shall (i) on written request of Seller, assign, to the extent assignable, its rights under such insurance policy or indemnification obligation with respect to such claim for Adverse Consequences to Seller and (ii) be relieved of any further obligation to pursue collection of such insurance or indemnification (except that, if requested to do so by Seller, Buyer shall reasonably cooperate with Seller, at Seller's sole expense, to collect any such insurance or indemnification).

26

## ARTICLE 11
DISPUTE RESOLUTION

11.1    Exclusive Procedure for Dispute Resolution.   Any dispute arising out of or relating to this Agreement or any of the agreements, documents and instruments executed and delivered in connection herewith and the transactions contemplated by any of the foregoing, including claims for indemnification pursuant to Article 8, shall be resolved in accordance with the procedures specified in this Article 11.

11.2    Negotiation Between Executives.

(a)    The Parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement or any of the agreements, documents and instruments executed and delivered in connection herewith and the transactions contemplated by any of the foregoing promptly by negotiation between the Seller and executives of Buyer who, if possible, shall be at a higher management level than the individuals with direct responsibility for administration of this Agreement (the "Negotiators"). Any Party may give the other Parties written notice of any dispute not resolved in the normal course of business. Within 15 days after delivery of the notice, the receiving Party shall submit to the others a written response. The notice and response shall include (i) a statement of each Party's position and a summary of arguments supporting that position, and (ii) the name and title of the Negotiators and of any other Person who will accompany them. Within 30 days after delivery of the disputing Party's notice, the Negotiators shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute. All reasonable requests for information made by one Party to the others will be honored.

(b)    If the matter has not been resolved by these Persons within 60 days of the disputing Party's notice, or if the Parties fail to meet within 30 days, any Party may initiate mediation as provided below.

(c)    All negotiations pursuant to this clause shall be confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and state rules of evidence.

11.3    Mediation. If the dispute has not been resolved by negotiation as provided above, the Parties shall endeavor to settle the dispute by mediation under the then current Center for Public Resources ("CPR") Model Procedure for Mediation of Business Disputes. The neutral third party will be selected from the CPR Panels of Neutrals, with the assistance of CPR, unless the Parties agree otherwise.

11.4    Litigation. If the dispute has not been resolved by non-binding means as provided herein within 90 days of the initiation of such procedure contemplated by Section 11.3 hereof, any Party may initiate litigation (upon 30 days written notice to the other Party); provided, however, that if one Party has requested the others to participate in a non-binding procedure and the others have failed to participate, the requesting Party may initiate litigation before expiration of such period.

11.5    Provisional Remedies. The procedures specified in this Article 11 shall be the sole and exclusive procedures for the resolution of disputes between the Parties arising out of or

27

relating to this Agreement; provided, however, that a Party, without prejudice to the above procedures, may file a complaint (for statute of limitations or venue reasons or to seek preliminary injunction or other provisional judicial relief), if in its reasonable judgment such action is necessary to avoid irreparable damage or to preserve the status quo.  Despite such action the Parties will continue to participate in good faith in following the dispute resolution procedures specified in this Article 11.

11.6    Tolling Statutes of Limitation.  All applicable statutes of limitation and defenses based upon the passage of time shall be tolled while the procedures specified in this Article 11 are pending. The Parties will take such action, if any, reasonably required to effectuate such tolling.

11.7    Performance to Continue.  Each Party shall continue to perform its obligations under this Agreement pending final resolution of any dispute arising out of or relating thereto.

ARTICLE 12
TERMINATION

12.1    Termination of Agreement.  The Parties may terminate this Agreement at any time prior to Closing as provided below:

(a)     Buyer and Seller may terminate this Agreement by mutual written consent;

(b)     Buyer may terminate this Agreement by giving written notice to the Seller in the event that (i) Seller has breached any representation, warranty or covenant contained in this Agreement in any material respect, Buyer has notified Seller of the breach, and the breach has continued without cure for a period of ten (10) business days after the notice of breach, (ii) Buyer reasonably determines that there has been a Material Adverse Effect with respect to the Seller and/or the Companies, Buyer gives written notice to Seller thereof within two (2) business days after its determination that a Material Adverse Effect has occurred, and the situation constituting the Material Adverse Effect has continued without cure for a period of ten (10) business days after the notice from Buyer; (iii) Buyer reasonably determines that new or changed information contained in any Disclosure Schedule Update reflects a Material Adverse Effect, Buyer gives written notice to Seller thereof within two (2) business days after receipt of the Disclosure Schedule Update, and such new or changed information contained therein is not removed from the Disclosure Schedule Update, as so amended or supplemented, within five (5) business days after Seller's receipt of such written notice from Buyer, or (iv) the Closing shall not have occurred on or before December 31, 2014 by reason of the failure of any condition precedent under Section 7.1 (unless the failure results primarily from Buyer's breach of any representation, warranty or covenant contained in this Agreement);

(c)     Seller may terminate this Agreement by giving written notice to Buyer in the event that (i) Buyer has breached any representation, warranty or covenant contained in this Agreement in any material respect, Seller has notified Buyer of the breach, and the breach has continued without cure for a period of 30 days after the notice of breach, or (ii) the Closing shall not have occurred on or before December 31, 2014 by reason of the failure of any condition precedent under Section 7.2 (unless the failure results primarily

28

from Seller's breach of any representation, warranty or covenant contained in this Agreement); and

(d)    by Seller, if Buyer fails to file a "Form A" application with the TDI within fifteen (15) business days of the Effective Date.

12.2    <u>Effect of Termination</u>.  Except for Section 12.3, Section 14.11 and the provisions of the Non-Disclosure Agreement (which shall survive the termination of this Agreement), upon the termination of this Agreement no party hereto or any of its officers, directors, partners, employees, agents, consultants, stockholders, principals or any other Affiliate shall have any rights, liabilities or obligations hereunder or with respect hereto; provided, however, that nothing contained in Section 12.1 or this Section 12.2 shall relieve any party from liability for any willful breach of any representation or warranty or willful failure to comply with any covenant or agreement contained herein occurring prior to the termination of this Agreement.

12.3    <u>Break Up Fees.</u>

(a)    Buyer shall deposit in a separate escrow account in the name of Mirage, the amount of $100,000 payable as a break-up fee to Seller in the event that Seller terminates this Agreement pursuant to Section 12.1(c) or Section 12.1(d); and

(b)    Mirage shall deposit in a separate escrow account in the name of Buyer, the amount of $100,000 payable as a break-up fee to Buyer in the event that Buyer terminates this Agreement pursuant to Section 12.1(b)(i) or Section 12.1(b)(iv).

ARTICLE 13<br>DEFINITIONS

For purposes of this Agreement, the following terms have the meanings specified:

"<u>Adverse Consequences</u>" means all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, Liabilities, obligations, Taxes, losses, expenses and fees, including court costs and reasonable attorneys' fees and expenses.

"<u>Affiliate</u>" means any Person that directly or indirectly controls, is controlled by, or is in common control with, any other Person.  For purposes of the preceding sentence, "control" means possession, directly or indirectly, of the power to direct or cause direction of management and policies through ownership of voting securities, contract, voting trust or otherwise.

"<u>Broker</u>" has the meaning set forth in Section 2.3.

"<u>Buyer</u>" has the meaning set forth in the preface.

"<u>Closing</u>" has the meaning set forth in Section 1.3.

"<u>Closing Date</u>" has the meaning set forth in Section 1.3.

"Closing Net Asset Value" shall mean the net asset value of the Companies, taken as a whole (including the surplus as regards policyholders for RFIC) and determined in accordance with GAAP, as of the Closing Date.

"Code" means the Internal Revenue Code of 1986, as amended.

"Companies" has the meaning set forth in the preface.

"CPR" has the meaning set forth in Section 11.3.

"Disclosure Schedule" has the meaning set forth in Section 1.2(d).

"Disclosure Schedule Update" has the meaning set forth in Section 5.7(a).

"Disputed Items" has the meaning set forth in Section 1.3(c).

"Environmental, Health, and Safety Laws" means any federal, state, or local statute, law, ordinance, code, order, injunction, decree, ruling; any regulations promulgated thereunder, or any nuisance, trespass, strict liability or negligence theory of liability which regulates or controls pollution or protection of the environment, public health and safety, or employee health and safety, including laws relating to emissions, discharges, releases, or threatened release of pollutants, contaminants, or chemical, industrial, toxic or Hazardous Substances or waste into ambient air, surface water, ground water or lands or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, or chemical, industrial, toxic or Hazardous Substances or waste.   The term specifically includes, without limitation: CERCLA; RCRA; the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.*, as amended; the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*, as amended; the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, as amended; the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, as amended; the Safe Water Drinking Act, 42 U.S.C. § 300f *et seq.*, as amended; the Emergency Planning and Community Right to Know Act, 42 U.S.C. § 1101 *et seq.*, as amended; the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et seq.*, as amended; the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.*, as amended; the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, as amended; any similar state or local statutes or ordinances and the regulations promulgated thereunder.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Fixed Assets" has the meaning set forth in Section 3.12.

"GAAP" has the meaning set forth in Section 3.7(a).

"GAAP Statements" has the meaning set forth in Section 3.7(a).

"Governing Documents" means, as to any Person, the articles of incorporation, certificate of formation or certificate of incorporation and code of regulations and/or bylaws (if such Person is a corporation); or the articles of organization, certificate of formation and company agreement (if such Person is a limited liability company); and other documents relating to and establishing or governing the existence and legal operation of such Person, of any type or nature, each as amended to date.

"Hazardous Substances" means any toxic substance, hazardous substance, hazardous waste, hazardous material, solid waste, residual waste, infectious waste, contaminant, pollutant, or constituent thereof, whether solid, semi-solid, liquid or gaseous, which are regulated, listed or controlled by Environmental, Health and Safety Laws.

"Indemnified Party" has the meaning set forth in Section 10.1.

"Indemnifying Party" has the meaning set forth in Section 10.1.

"Knowledge of Seller" or "Knowledge of Mirage" and all similar phrases relating to facts designated herein as known to Seller or Mirage means the actual knowledge of Seller without any obligation to make inquiry or investigation.

"Lease" has the meaning set forth in Section 5.10.

"Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"Material Adverse Effect" means, with respect to any Person, any change or effect that is materially adverse to the business or financial condition of such Person and its Subsidiaries as a whole.  With respect to the Seller, any change or effect that results in (i) the reduction of the aggregate net asset value of the Companies taken as a whole (including the surplus as regards policyholders of RFIC) in an amount exceeding five hundred thousand dollars ($500,000); or (ii) the surplus as regards policyholders of RFIC falls below the minimum amount required by law, shall be deemed to be a Material Adverse Effect.

"Most Recent Financial Statements" has the meaning set forth in Section 3.7(a).

"Most Recent Fiscal Period End" has the meaning set forth in Section 3.7(a).

"Negotiators" has the meaning set forth in Section 11.2(a).

"Net Loss Development" shall mean (w) loss and expense reserves, including reserves for losses incurred but not reported, for losses with a loss date prior to the Closing Date outstanding as of December 31, 2015, *plus* (x) losses and expenses paid during the period from the Closing Date to December 31, 2015 for losses with a loss date prior to the Closing Date, *minus* (y) loss and expense reserves, including reserves for losses incurred but not reported, outstanding at the Closing Date, *minus* (z) a $75,000 allowance.

"Non-Disclosure Agreement" means that certain Non-Disclosure Agreement dated June 25, 2014 by and between Buyer and Seller.

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice.

"Parties" and "Party" have the meaning set forth in the preface.

"Person" means a natural person, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated

31

organization or a governmental entity (or any department, agency or political subdivision thereof).

"Purchase Price" has the meaning set forth in Section 1.2.

"Reasonable Best Efforts" or phrases similar thereto means the reasonable commercial efforts that a prudent Person desirous of achieving a result would use in similar circumstances in an effort to ensure that such result is achieved as expeditiously as possible. As used herein, the term "Reasonable Best Efforts" shall not include any obligation on the part of Seller or any of the Companies to agree to any material adverse modification of the terms of any document or contractual arrangement or to repay or incur additional material obligations to any Person that would be effective prior to the Closing or to pay any monetary amount or other expenses exceeding, in the aggregate, $2,500 in furtherance of such efforts.

"RFIC" has the meaning set forth in the preface.

"Securities Act" means the Securities Act of 1933, as amended.

"Security Interest" means any mortgage, pledge, lien, encumbrance, charge or other security interest, other than (a) mechanic's and similar liens, (b) liens for Taxes not yet due and payable or for Taxes that the taxpayer is contesting in good faith through appropriate proceedings, (c) purchase money liens and liens securing rental payments under capital lease arrangements, and (d) other liens arising in the Ordinary Course of Business and not incurred in connection with the borrowing of money.

"Seller" has the meaning set forth in the preface.

"Shares" has the meaning set forth in the Recitals.

"Spindletop" has the meaning set forth in the preface.

"SSUGA" has the meaning set forth in the preface.

"Starting Net Asset Value" shall mean the aggregate net asset value of the Companies, taken as a whole (including the surplus as regards policyholders for RFIC) and determined in accordance with GAAP, as of June 30, 2014.

"Subsidiary" means, when used with reference to an entity, any other entity of which the first entity owns directly or indirectly more than 50% of the outstanding securities entitled generally to vote for the election of directors or other persons performing similar functions.

"Tax" means any federal, state, local or foreign income, gross receipts, gross income, capital gains, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum or other tax of any kind whatsoever, including any interest, penalty or addition thereto.

"Tax Benefit" has the meaning set forth in Section 10.3(a).

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"TDI" means the Texas Department of Insurance.

"Third Party Claim" has the meaning set forth in Section 10.1.

## ARTICLE 14
## MISCELLANEOUS

14.1   Press Releases and Public Announcements.  Neither Buyer nor Seller shall issue any press release or make any public announcement relating to the subject matter of this Agreement prior to the Closing without the prior written approval of Buyer and the Seller.

14.2   No Third-Party Beneficiaries.  This Agreement and the other agreements, certificates and instruments contemplated hereby shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

14.3   Entire Agreement.  This Agreement, including the documents referred to herein, constitutes the entire agreement among the Parties and supersedes all prior understandings, agreements and representations by or among the Parties, written or oral, to the extent relating in any way to the subject matter hereof; provided, however, that the Non-Disclosure Agreement shall survive execution of this Agreement and be deemed incorporated herein by this reference to the extent it does not conflict with the terms of this Agreement.

14.4   Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any rights, interests or obligations hereunder without the prior written approval of the other Parties.

14.5   Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

14.6   Headings.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

14.7   Notices.  All notices, requests, demands, claims, and other communications hereunder shall be in writing.  Any notice, request, demand, claim or other communication hereunder shall be deemed duly given if (and then five business days after) it is sent by registered or certified mail, return receipt requested, postage prepaid, and addressed to the intended recipient as set forth below:

> If to Seller:        c/o  Ted Moor Jr.
> Mirage Interests, Inc.
> 505 Orleans, Suite 502
> Beaumont, Texas  77701
> Telephone: (409) 832-4565

33

|              | Fax: (409) 832-4574 |
|--------------|---------------------|

Copy to:      Winstead PC
              401 Congress Avenue, Suite 2100
              Austin, Texas  78701
              Telephone:  (512) 370-2800
              Fax: (512) 370-2850
              Attention:  Keith Hopkinson, Esq.

If to Buyer:  c/o Mitch Sattler
              Anchor Insurance Holdings, Inc.
              14018 18th Place East
              Bradenton, FL 34212
              msattler@anchorpcins.com

Copy to:      Sandy P. Fay, Esq.
              Colodny, Fass, Talenfeld, Karlinsky, Abate & Webb, P.A.
              One Financial Plaza, 23rd Floor
              100 Southeast Third Avenue
              Ft. Lauderdale, Florida 33394

Any Party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the address set forth above using any other means (including personal delivery, expedited or air courier, messenger service, telecopy, telex, ordinary mail, or electronic mail), but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient.  Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

14.8    Governing Law, Consent to Jurisdiction.  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Texas without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State Texas.  SUBJECT IN ALL RESPECTS TO ARTICLE 11, THE PARTIES HEREBY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF TEXAS LOCATED IN TRAVIS COUNTY, AND THE UNITED STATES DISTRICT COURT WESTERN DISTRICT LOCATED IN AUSTIN, TEXAS SOLELY WITH RESPECT TO ACTIONS RELATED TO THIS AGREEMENT.  EACH PARTY HEREBY WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS, AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER, AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT.

14.9    Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by all Parties hereto.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default,

34

misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

14.10   Severability.   Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

14.11   Expenses.  Buyer shall bear its own costs, fees and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.   Mirage shall bear its own costs, fees and expenses (including all legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

14.12   Incorporation of Exhibits and Schedules.   The Exhibits and Schedules identified in this Agreement (including the Disclosure Schedules) are incorporated herein by reference and made a part hereof.  Any disclosure by Seller in any Disclosure Schedule attached hereto shall constitute a disclosure under each other Disclosure Schedule referred to therein, whether or not such disclosure is specifically referenced within such other Disclosure Schedule.

14.13   Interpretation.   As used in this Agreement, (a) "including" means "including, without limitation"; and (b) all dollar amounts are expressed in United States funds.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by all parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

14.14   **WAIVER OF JURY TRIAL.  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BUYER AND SELLER HEREBY IRREVOCABLY AND EXPRESSLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER DOCUMENTS AND AGREEMENTS DELIVERED IN CONNECTION HEREWITH, THE TRANSACTION OR THE ACTIONS OF BUYER OR SELLER IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT HEREOF OR THEREOF.**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**BUYER:**

ANCHOR INSURANCE HOLDINGS, INC.,

By: _____

Name: Mitch Sattler

Title: President and CEO

**SELLER:**

MIRAGE INTERESTS, INC.

By: _____

Name: Wesley W. Shipley

Title: Vice President

Exhibit 3 to Exhibit 2

## ESCROW AGREEMENT

This Escrow Agreement (this "Agreement") is entered into as of November ___, 2014 ("Effective Date"), by and among Anchor Insurance Holdings, Inc., a Florida corporation ("Anchor"), Mirage Interest, Inc., a Texas corporation ("Mirage"), and Milam Howard Nicandri Dees & Gillam, P.A., a Florida professional association ("Escrow Agent").

## RECITALS

A.     Anchor and Mirage have entered into that certain Stock Purchase Agreement dated August 15, 2014 (the "SPA"), attached hereto as **Exhibit A**, wherein Anchor has agreed to purchase certain stock owned by Mirage, and Mirage has agreed to sell the same.

B.     Pursuant to the SPA, and in fulfillment of the requirements under 1.2(b) of the SPA, Anchor agrees to deposit five hundred thousand dollars ($500,000) (the "Escrow Funds") with the Escrow Agent to be held in accordance with the terms and conditions of this Agreement.

## AGREEMENTS

**NOW, THEREFORE,** in consideration of the premises and the mutual obligations and promises contained in this Agreement, Anchor, Mirage, and Escrow Agent hereby agree as follows:

1.     Recitals.  The above recitals are true and correct and are incorporated herein by this reference.

2.     Appointment.  Anchor and Mirage hereby appoint and designate Milam Howard Nicandri Dees & Gillam, P.A., as Escrow Agent to perform its duties and obligations in accordance with the terms and provisions of this Agreement. Escrow Agent hereby accepts such appointment and agrees to perform in accordance with this Agreement.

3.     Escrow Funds.  Escrow Funds shall be delivered to Escrow Agent by Anchor on or before the Effective Date.  The parties hereto agree that the Escrow Funds shall be held by Escrow Agent and disbursed in accordance with the following:

(a)     Within three (3) business days of the Escrow Agent's receipt of written instructions signed by Anchor and Mirage  (the "Disbursement Notice"), the Escrow Agent shall disburse the Escrow Funds in accordance with such instructions.

(b)     On March 1, 2016, Escrow Agent shall promptly disburse any Escrow Funds remaining in the escrow account to Mirage.

4.     Duties of Escrow Agent.  Escrow Agent's duties and responsibilities shall be limited to those expressly set forth in this Agreement.  It shall be sufficient if any document described herein is delivered to Escrow Agent and purports on its face to be correct in form and signed and otherwise executed by the party or parties required to sign or execute the same as indicated therein. Escrow Agent shall not be required in any way to determine the identity or authority of any person

executing the same or the genuineness of any signature.

5.     Liability and Risk of Loss.  Upon disbursement or return of the Escrow Funds in accordance with the terms of this Agreement, this Agreement shall terminate and Escrow Agent shall be discharged and released from any and all liability hereunder. Escrow Agent shall not be liable for any error in judgment, any act or omission, any mistake of law or fact, or for anything that it may do or refrain from doing in connection herewith, except for its own gross negligence. Anchor and Mirage jointly and severally agree to indemnify and hold Escrow Agent harmless from and against any losses, costs, damages, expenses, claims and attorneys' fees and costs suffered or incurred by Escrow Agent in connection with or arising out of this Agreement.  Anchor and Mirage recognize and acknowledge that Escrow Agent is serving as escrow agent without compensation solely as an accommodation to them, and agree that Escrow Agent shall not be liable to any of them for any act or omission hereunder or any matter or thing arising out of the conduct of Escrow Agent hereunder, except for its gross negligence.

6.     Disputes.  In the event: (a) there shall be any dispute between Escrow Agent, Anchor, and/or Mirage with respect to any matter arising under this Agreement; or (b) there shall be any uncertainty as to the meaning or the applicability of any of the provisions hereof or any written instructions received by Escrow Agent pursuant to this Agreement, Escrow Agent may, at its option at any time thereafter, deposit the Escrow Funds with the Duval County Circuit Court, or take such affirmative steps as Escrow Agent may elect in order to substitute an impartial party to hold the Escrow Funds and act as escrow agent hereunder, and, upon making such deposit, Escrow Agent shall be discharged and released from any and all liability under this Agreement or any other agreement giving rise to any obligation on the part of Escrow Agent.

7.     Recognition of Status as Attorney.  Mirage acknowledges that Escrow Agent is acting as attorney for Anchor in other matters.  In the event of any dispute between Mirage and Anchor, Mirage acknowledges and agrees that Escrow Agent may represent Anchor.

8.     Notices.  Any notice required or permitted to be given by any party hereto shall be considered properly given if in writing and (a) hand-delivered together with a receipt therefor, or (b) sent by commercially recognized national overnight courier and addressed to the respective party as follows (unless changed by similar notice in writing given by the particular party whose address is to be changed):

If to Anchor:          Anchor Insurance Holdings, Inc.
                       14018 18th Place East
                       Bradenton, Florida  34212
                       Attention:  Jennifer Pintacuda

If to Mirage:          Mirage Interests, Inc.
                       505 Orleans, Suite 502
                       Beaumont, Texas 77701
                       Attention: Ted Moor Jr.

        If to Escrow Agent:       Milam Howard Nicandri Dees & Gillam, P.A.
                                    14 East Bay Street
                                    Jacksonville, Florida  32202
                                    Attention G. Alan Howard, Esq.

All notices by hand-delivery or overnight courier shall be deemed delivered upon receipt.

        9.    <u>Miscellaneous</u>**.**  This Agreement shall be governed by the laws of the State of Florida.  Anchor, Mirage, and Escrow Agent each hereby submits to personal jurisdiction in any action and for all matters which shall arise with respect to this Escrow Agreement.  Time shall be deemed to be of the essence with respect to all provisions of this Agreement.  This Agreement may be amended, modified, waived or terminated only by written instrument duly signed by the parties hereto or their respective successors and assigns.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, and their respective representatives, successors and assigns.  This Agreement may be executed in one or more counterparts, each such counterpart being an original hereof and all such counterparts taken together constituting one and the same instrument.

***SIGNATURES APPEAR ON THE FOLLOWING PAGE***

**IN WITNESS WHEREOF**, this Escrow Agreement has been duly executed by the undersigned as of the date first written above.

**ANCHOR:**

Anchor Insurance Holdings, Inc.

By: _____
      Jennifer Pintacuda, Chief Financial Officer

**MIRAGE:**

Mirage Interests, Inc.

By: _____
      Ted Moor, Jr., its authorized officer

**ESCROW AGENT:**

Milam Howard Nicandri Dees & Gillam, P.A.

By: _____
      G. Alan Howard, President

4

# Exhibit 3 – Unsigned Escrow Agreement

## ESCROW AGREEMENT

This Escrow Agreement (this "Agreement") is entered into as of November ___, 2014 ("Effective Date"), by and among Anchor Insurance Holdings, Inc., a Florida corporation ("Anchor"), Mirage Interest, Inc., a Texas corporation ("Mirage"), and Milam Howard Nicandri Dees & Gillam, P.A., a Florida professional association ("Escrow Agent").

### RECITALS

A.     Anchor and Mirage have entered into that certain Stock Purchase Agreement dated August 15, 2014 (the "SPA"), attached hereto as **Exhibit A**, wherein Anchor has agreed to purchase certain stock owned by Mirage, and Mirage has agreed to sell the same.

B.     Pursuant to the SPA, and in fulfillment of the requirements under 1.2(b) of the SPA, Anchor agrees to deposit five hundred thousand dollars ($500,000) (the "Escrow Funds") with the Escrow Agent to be held in accordance with the terms and conditions of this Agreement.

### AGREEMENTS

**NOW, THEREFORE,** in consideration of the premises and the mutual obligations and promises contained in this Agreement, Anchor, Mirage, and Escrow Agent hereby agree as follows:

1.     <u>Recitals</u>.  The above recitals are true and correct and are incorporated herein by this reference.

2.     <u>Appointment</u>.  Anchor and Mirage hereby appoint and designate Milam Howard Nicandri Dees & Gillam, P.A., as Escrow Agent to perform its duties and obligations in accordance with the terms and provisions of this Agreement.  Escrow Agent hereby accepts such appointment and agrees to perform in accordance with this Agreement.

3.     <u>Escrow Funds</u>.  Escrow Funds shall be delivered to Escrow Agent by Anchor on or before the Effective Date.  The parties hereto agree that the Escrow Funds shall be held by Escrow Agent and disbursed in accordance with the following:

(a)     Within three (3) business days of the Escrow Agent's receipt of written instructions signed by Anchor and Mirage  (the "Disbursement Notice"), the Escrow Agent shall disburse the Escrow Funds in accordance with such instructions.

(b)     On March 1, 2016, Escrow Agent shall promptly disburse any Escrow Funds remaining in the escrow account to Mirage.

4.     <u>Duties of Escrow Agent</u>.  Escrow Agent's duties and responsibilities shall be limited to those expressly set forth in this Agreement.  It shall be sufficient if any document described herein is delivered to Escrow Agent and purports on its face to be correct in form and signed and otherwise executed by the party or parties required to sign or execute the same as indicated therein. Escrow Agent shall not be required in any way to determine the identity or authority of any person

executing the same or the genuineness of any signature.

5.   <u>Liability and Risk of Loss</u>.  Upon disbursement or return of the Escrow Funds in accordance with the terms of this Agreement, this Agreement shall terminate and Escrow Agent shall be discharged and released from any and all liability hereunder. Escrow Agent shall not be liable for any error in judgment, any act or omission, any mistake of law or fact, or for anything that it may do or refrain from doing in connection herewith, except for its own gross negligence. Anchor and Mirage jointly and severally agree to indemnify and hold Escrow Agent harmless from and against any losses, costs, damages, expenses, claims and attorneys' fees and costs suffered or incurred by Escrow Agent in connection with or arising out of this Agreement.  Anchor and Mirage recognize and acknowledge that Escrow Agent is serving as escrow agent without compensation solely as an accommodation to them, and agree that Escrow Agent shall not be liable to any of them for any act or omission hereunder or any matter or thing arising out of the conduct of Escrow Agent hereunder, except for its gross negligence.

6.   <u>Disputes</u>.  In the event: (a) there shall be any dispute between Escrow Agent, Anchor, and/or Mirage with respect to any matter arising under this Agreement; or (b) there shall be any uncertainty as to the meaning or the applicability of any of the provisions hereof or any written instructions received by Escrow Agent pursuant to this Agreement, Escrow Agent may, at its option at any time thereafter, deposit the Escrow Funds with the Duval County Circuit Court, or take such affirmative steps as Escrow Agent may elect in order to substitute an impartial party to hold the Escrow Funds and act as escrow agent hereunder, and, upon making such deposit, Escrow Agent shall be discharged and released from any and all liability under this Agreement or any other agreement giving rise to any obligation on the part of Escrow Agent.

7.   <u>Recognition of Status as Attorney</u>.  Mirage acknowledges that Escrow Agent is acting as attorney for Anchor in other matters.  In the event of any dispute between Mirage and Anchor, Mirage acknowledges and agrees that Escrow Agent may represent Anchor.

8.   <u>Notices</u>.  Any notice required or permitted to be given by any party hereto shall be considered properly given if in writing and (a) hand-delivered together with a receipt therefor, or (b) sent by commercially recognized national overnight courier and addressed to the respective party as follows (unless changed by similar notice in writing given by the particular party whose address is to be changed):

|  |  |
|---|---|
| If to Anchor: | Anchor Insurance Holdings, Inc. |
|  | 14018 18th Place East |
|  | Bradenton, Florida  34212 |
|  | Attention:  Jennifer Pintacuda |
|  |  |
| If to Mirage: | Mirage Interests, Inc. |
|  | 505 Orleans, Suite 502 |
|  | Beaumont, Texas 77701 |
|  | Attention: Ted Moor Jr. |

If to Escrow Agent:      Milam Howard Nicandri Dees & Gillam, P.A.
                        14 East Bay Street
                        Jacksonville, Florida  32202
                        Attention G. Alan Howard, Esq.

All notices by hand-delivery or overnight courier shall be deemed delivered upon receipt.

      9.    <u>Miscellaneous</u>**.**  This Agreement shall be governed by the laws of the State of Florida.  Anchor, Mirage, and Escrow Agent each hereby submits to personal jurisdiction in any action and for all matters which shall arise with respect to this Escrow Agreement.  Time shall be deemed to be of the essence with respect to all provisions of this Agreement.  This Agreement may be amended, modified, waived or terminated only by written instrument duly signed by the parties hereto or their respective successors and assigns.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, and their respective representatives, successors and assigns.  This Agreement may be executed in one or more counterparts, each such counterpart being an original hereof and all such counterparts taken together constituting one and the same instrument.

*SIGNATURES APPEAR ON THE FOLLOWING PAGE*

**IN WITNESS WHEREOF**, this Escrow Agreement has been duly executed by the undersigned as of the date first written above.

**ANCHOR:**                                    **ESCROW AGENT:**

Anchor Insurance Holdings, Inc.                Milam Howard Nicandri Dees & Gillam, P.A.

By: _____          By: _____
    Jennifer Pintacuda, Chief Financial Officer            G. Alan Howard, President

**MIRAGE:**

Mirage Interests, Inc.

By: _____
    Ted Moor, Jr., its authorized officer